[No. C015891. Third Dist. Jan. 28, 1998.]

AL FRANK AKINS et al., Plaintiffs and Respondents, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

**6**

**COUNSEL**

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Marvin Goldsmith and Margaret Rodda, Assistant Attorneys General, Darryl L. Doke, James H. Wernicke and David DeAlba, Deputy Attorneys General, Downey, Brand, Seymour & Rohwer, Thomas N. Cooper, Ronald Liebert, Gordon B. Burns, Hardy, Erich, Brown & Wilson, David S. Worthington and Barbara Gould Archibald for Defendants and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Richard M. Frank, Assistant Attorney General, Ellison, Schneider & Lennihan and Martha H. Lennihan as Amici Curiae on behalf of Defendants and Appellants.

Desmond, Miller & Desmond, Richard F. Desmond, Gary Livaich, Dopkins & Rolfe, William E. Dopkins III, Gordon & Rees, Douglas B. Harvey, Goldstein & Goldstein, David Collins, Kronick, Moskovitz, Tiedemann & Girard and Lloyd Hinkelman for Plaintiffs and Respondents.

## OPINION

**SIMS, Acting P. J.**—Defendants State of California, Reclamation District 1000 (RD 1000), and American River Flood Control District (ARFCD) appeal from a judgment, following a bench trial, finding defendants liable for inverse condemnation claims of 25 plaintiffs whose personal and real property were damaged by flooding during heavy storms in February 1986.[1]

Except for plaintiffs whose properties were located in an area known as Strawberry Manor, plaintiffs' properties were damaged when flood control works that were designed to protect lower lying lands created a hydraulic

---

[1]This action involves more than 400 plaintiffs who own approximately 150 parcels of real property. By stipulation of the parties, the action was trifurcated, the issues of liability and proximate cause as to all plaintiffs were separately tried, and the parties stipulated to the recoverable amount of damages (approximately $600,000, plus $400,000 interest) as to 25 "representative" plaintiffs owning a dozen parcels of real property. Judgment was entered in favor of the 25 representative plaintiffs, with a direction in the judgment that judgment "shall be subsequently entered" in favor of the remaining plaintiffs upon proof of damages to compensable interests (estimated at $10 million damages plus $10 million in interest) and a finding that special defenses do not bar liability. Although damage issues remain as to the nonrepresentative plaintiffs, the one final judgment rule is not violated by appellate review of a judgment which leaves nothing to be decided between one or more parties and their adversaries. (See *Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725, 741 [29 Cal.Rptr.2d 804, 872 P.2d 143].) The judgment in this case leaves nothing to be decided between defendants and the 25 representative plaintiffs. Although our reference to "plaintiffs" in this opinion will refer only to the representative plaintiffs who are the subject of this appeal, our decision on the merits of the liability issues in this appeal will affect all 400+ plaintiffs.

The representative plaintiffs who obtained a judgment in their favor are: Julio T., Hazel H. and Michael Barosso; George and Margaret Rosenberg; Scott E. Baron; Charles and Martha E. Jones; Mark W. Watkins and Janet Watkins; Abram White and Ruth Elaine White, individually and doing business as White Cleaning Specialists; Lee W. and Shirley A. Collier; Kenneth C., Nina J., Randall L. and Lisa Kellogg; Robert E. and Madelyn R. Riggan; Lawrence A., Carol A. and Carla M. Risse; and Oystein A. and Amie K. Skeie.

The trial court found representative plaintiff Alice F. Harris is not entitled to a judgment against any of the defendants, but the judgment which is the subject of this appeal does not mention her. She is not a party to this appeal.

dam and backwater effect that caused flooding of plaintiffs' upper lying lands. As to plaintiffs located in Strawberry Manor, liability was predicated in part on defendants' failure to have a flood watch plan to close a gap built into a levee, thereby causing a failure in a system designed to protect that territory.

Defendants contend, among other things, that they are not liable because plaintiffs must prove and failed to prove unreasonable conduct by the defendants, pursuant to a rule first enunciated in *Belair* v. *Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550 [253 Cal.Rptr. 693, 764 P.2d 1070] (*Belair*).

The California Supreme Court granted review of our original opinion in this case, and later transferred the case back to us with directions to vacate our original opinion and reconsider in light of *Bunch* v. *Coachella Valley Water Dist.* (1997) 15 Cal.4th 432 [63 Cal.Rptr.2d 89, 935 P.2d 796] (*Bunch II*). We vacated our original opinion. All parties filed supplemental briefs.[2]

We shall conclude the reasonableness test does not apply if governmental flood control works cause flooding by intentionally diverting water to upstream private property which was not historically subject to flooding, in order to protect lower lying land. We shall therefore reverse the judgment and remand for the limited purpose of having the trial court make a finding on the issue whether plaintiffs' properties (other than Strawberry Manor) were historically subject to flooding in the absence of the flood control works at issue in this litigation.

We shall also conclude that, although *Belair*'s reasonableness test applies to the flooding of Strawberry Manor, remand is required for the trial court to evaluate reasonableness under factors first adopted in cases postdating the trial court's decision—*Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327 [27 Cal.Rptr.2d 613, 867 P.2d 724], and *Bunch II, supra,* 15 Cal.4th 432.

---

[2]Some parties go beyond the proper scope of supplemental briefing, which is supposed to be "limited to matters arising after the previous decision of the Court of Appeal unless the presiding justice permits briefing on other matters." (Cal. Rules of Court, rule 29.4(f).) No party requested or received permission to exceed this scope. We need not consider arguments which exceed the proper scope of supplemental briefing.

In addition to making their own arguments in their supplemental briefs, (1) ARFCD joins in the briefs of RD 1000 and the state (except insofar as the state argues the local districts have sole liability), and (2) RD 1000 "incorporate[s] by reference those portions of the supplemental briefs of [the state and ARFCD] which discuss liability for the areas of Rio Linda and north of Sankey Road." The state "incorporate[s] by reference" only the facts in its codefendants' briefs.

We shall also remand the case for the trial court to consider the proportionate liability of each defendant found to be liable.[3]

## Factual and Procedural Background

Plaintiffs' properties are located in Sutter and Sacramento Counties, generally to the east and north of the public improvements in question. In their natural condition, plaintiffs' lands drained to the west into an area known as the "American Basin." The American Basin is a large area of low-lying lands bounded generally by the Bear River on the north, the Feather River and Sacramento River on the west, the American River on the south, and higher ground to the east. The American River flows west into the Sacramento River. In its natural condition the American Basin eventually drains into the Sacramento River and out to the sea.

The parties have divided the properties that are the subject of this litigation into three distinct geographical areas:

1. "North of Sankey Road"—land in Sutter County lying east of the American Basin and north of Sankey Road;

2. "Rio Linda"—land in Sutter and Sacramento Counties, lying east of the American Basin and south of Sankey Road, bordered by Sankey Road on the north and Dry Creek on the south; and

3. "Strawberry Manor"—a housing development in the City of Sacramento, lying east of the American Basin and south of the other two groups of damaged properties. Strawberry Manor lies within the geographical territory of ARFCD and is adjacent to Arcade Creek and Rio Linda Boulevard.

The public improvements which caused the damage in this case are part of the Sacramento River Flood Control Project (SRFCP). The portions of the SRFCP at issue protect the lower lying lands to the west and south of plaintiffs' properties, including the American Basin and downtown Sacramento. Levees and the Natomas East Main Drain (NEMD), an artificially created canal running north to south along the east border of the American Basin, protect the American Basin by diverting surface and stream waters that flow from the east. These public works prevent the flow from entering the American Basin. The diverted waters flow either south in the NEMD into

---

[3]In the original proceedings on appeal, we granted a request of the Association of California Water Agencies to file an amicus curiae brief in support of ARFCD. Following transfer by the Supreme Court, we granted a timely request by the Delta Protection Commission to file an amicus curiae brief in favor of defendants.

the American River, or north into the artificially created Natomas Cross Canal (the Cross Canal), which carries the water west to the Sacramento River.

Running along the west side of the NEMD is a "back levee" (which is also called the "east levee" because it borders the east side of RD 1000). Running along the east side of the NEMD are railroad levees with numerous openings that allow water from the east to drain downhill to the west.

The genesis of the public works dates back to 1911, when the state adopted a California Debris Commission Report (the Jackson Report), which provided for the construction of levees along the Sacramento and American Rivers and their tributaries to protect and reclaim the adjacent areas.

RD 1000 was created in 1911 by the state Legislature for the purpose of reclaiming the land of the American Basin and to prevent further flooding of that land. In 1916, RD 1000 designed and constructed the NEMD and back levee. RD 1000, together with another reclamation district to its immediate north, also built the Cross Canal. RD 1000 is thus bounded on the west by the Sacramento River, on the north by the Cross Canal, on the east by the back levee and the NEMD, and on the south by the American River. The purpose of the NEMD and back levee was to reclaim land of the American Basin located within RD 1000 by collecting stream and surface waters flowing from the east and diverting those waters into the NEMD. The back levee diverted Dry Creek, Arcade Creek, and other streams from their natural course, obstructing the normal passage of those streams into the American Basin and raising water levels east of the back levee. The NEMD then carried the diverted waters south to the American River and north to the Cross Canal, which in turn carried water west to the Sacramento River. As found by the trial court, the natural drainage was dammed and diverted by the combined effects of the project.

Studies and reports from that time period recognized that the public works created a risk of flooding upstream property to the east under certain circumstances.

In 1927 the state Legislature created ARFCD, whose territory lies to the east of the NEMD, to protect lands in the cities of Sacramento and North Sacramento and their environs. In 1935, levees were constructed along both sides of the American River and the south side of Arcade Creek.

In the 1950's, the United States Corps of Engineers began constructing a system of integrated flood control facilities in the Sacramento region

(SRFCP), including levees in ARFCD's area. The existing works were incorporated into this system.

In 1953, the SRFCP works were transferred to the state. A memorandum of understanding confirmed the state's obligation to operate and maintain all completed works of the SRFCP and to hold the federal government harmless. The state turned the levees over to the local districts for maintenance and operation but maintained responsibility for the project.

One of the levees in ARFCD's territory has a gap where the Rio Linda Bridge crosses Arcade Creek. Defendants had no set plan to close that gap at high flood stages.

By 1956, the Corps of Engineers completed construction of Folsom Dam (which is operated by the United States Bureau of Reclamation), along with additional levees on the American River below the dam. These levees were then turned over to the State of California and accepted by the state for maintenance and operation. The levees were constructed to protect and reclaim low lands of the City of Sacramento and its suburbs, which were then extensively developed as residential areas.

Also in 1956, the state asked the Corps of Engineers to assume responsibility for the entire east side of the NEMD because of the perceived risk to lands to the east. The Corps of Engineers refused.

In February 1986, during unusually heavy storm conditions, when flows were high in both the Sacramento and American Rivers, waters in the NEMD and Cross Canal created a "hydraulic dam"[4] and backwater effect,[5] causing flooding of plaintiffs' properties. Lands to the west and south of plaintiffs' properties were saved from flood damage. In Strawberry Manor, the City of Sacramento (which is not a party to this appeal) during the midst of the storms attempted to close the gap in the levee at the Rio Linda Boulevard Bridge with sandbags, but the sandbagging was negligently performed and was ultimately unsuccessful, causing flood damage to Strawberry Manor.

In December 1986, more than 400 plaintiffs filed this action alleging various theories against various public entities. In 1992, following pretrial proceedings and settlements, the case proceeded to a bench trial against the

---

[4]A "hydraulic dam" occurs when the water itself acts as a dam, preventing water from flowing out of the channel.

[5]"Backwater" is water backed up or retarded in its course as compared with its normal or natural condition of flow. It refers to the consequences upstream from a hydraulic dam downstream.

three remaining defendants on a sole theory of inverse condemnation. The trial court found liability, and the parties stipulated to damages totaling approximately $600,000 (plus approximately $400,000 interest) for the representative plaintiffs. (See fn. 1, *ante*.)

In its statement of decision, the trial court concluded that "[a]s a result [of the diversion of water], under certain conditions, a hydraulic dam effect was created in the NEMD during high stages in the American River. This hydraulic dam effect impeded the diverted flow of water from the NEMD into the American River, resulting in higher water elevations in the NEMD and to the east. . . . [¶] . . . [T]he SRFCP creates a hydraulic dam effect under certain conditions in the Sacramento River. This hydraulic dam effect impeded the diverted flow of water from the NEMD into the Cross Canal and the Sacramento River, resulting in higher water elevations in the NEMD which caused overtopping and collapse of the old Sacramento Northern Railway which acted as the east levee of the NEMD north of Sankey Road."

Without these diversions, said the court, plaintiffs' properties would not have been damaged.

The trial court further found RD 1000 also added fractionally to the problem south of Sankey Road with two pumping plants that pumped surface water upstream out of the District into the NEMD.

As also found by the trial court, studies and reports dating back to the early 1900's (including the Jackson Report and subsequent reports adopted by the state) "*recognized the hydraulic dam and backwater effects which the back levees and discharges at the American River would cause and the need for protecting upstream properties. The State in the Bailey Report recognized that the lands east of RD 1000's back levees would be subjected to flooding and that the hazard needed to be addressed in order to protect these lands.*" (Italics added.)

As further stated by the court: "Throughout the February 1986 flood, RD 1000's system, including the levees, pumps, and other works *operated and functioned as designed* to successfully protect the land and extensive urban improvements located in the American Basin within the boundaries of RD 1000 from extensive flooding of the entire basin which would have occurred in February 1986 absent the works of SRFCP including, but not limited to, the back levee of RD 1000." (Italics added.)

The court continued: "The construction of Folsom Dam was designed to release 115,000 cfs. on all but rare occasions. As a result of the intense

rainfall during February 1986, releases into the American River at Folsom Dam were increased to 130,000 cfs. for a period of time between February 18 and February 19, 1986." "The higher flow rates resulting from increased releases at Folsom Dam were fully channelized and contained by the levees protecting RD 1000 and the American River levees, none of which failed, and which successfully protected the City of Sacramento (including North Sacramento), the American Basin and the developed areas adjacent to those levees from flooding. *The evidence is conclusive that, with the exception of the Rio Linda Boulevard Bridge [in the Strawberry Manor area], the system functioned as it was designed and intended.* Therefore, whether or not the flows or elevations exceeded 'design capacity' is irrelevant under the facts of this case because the successful containment of those waters was actually the substantial cause of the induced flooding and the plaintiffs' injury." (Italics added.)

"The cumulative and combined effects of this channelization and containment of the waters of the SRFCP created a hydraulic dam at each end of the NEMD. *This hydraulic dam, coupled with the effects of the earthen dam and pumps 6 and 8, caused induced flooding on plaintiffs' properties and caused their property to be appropriated by defendants as a temporary retention basin for storing the diverted waters.*" (Italics added.)

"North of Sankey Road the project caused levees protecting plaintiffs' lands to the east to be overtopped and break. The backwater effect from the American River extended to Sankey Road in the north, causing diverted streams and intermittent water courses and surface waters to overtop the railroads and flood plaintiffs' properties. South of Dry Creek the project caused Arcade Creek to escape its banks at Hagginwood Park and to overtop the Rio Linda Boulevard Bridge and escape through the gap in the levee."

"The area north of Dry Creek west of Rio Linda Boulevard extending into Sutter County north of the cross canal flooded because of the project induced backwater effect in the NEMD and the Natomas Cross Canal, and the diversion of the streams and surface waters that formerly flowed into the American Basin."

As to Strawberry Manor, the court found the primary cause of flooding was the gap at the Rio Linda Boulevard Bridge, the absence of a plan to close the gap was a substantial cause of plaintiffs' damages, and the hydraulic dam effect of the back levee and the NEMD was also a substantial concurring cause.

The trial court further stated:

"The storm of 1986 was not such an extraordinary storm that would constitute a sole intervening cause which supersedes the public improvement in the chain of causation."

"The levee system protecting RD 1000 and the Cities of Sacramento, North Sacramento and their environs within the boundaries of the ARFCD and RD 1000 *functioned as they were designed to function* during the flood of 1986 and successfully protected the areas that were designed to be protected with the one exception of the gaps at Strawberry Manor. Because of the protection afforded to these areas, the plaintiffs' properties were flooded, including Strawberry Manor. The damages to other citizens which were prevented by such protection were in excess of seven billion dollars."[6] (Italics added.)

The trial court rejected the defense argument that liability depended on a finding of unreasonable conduct under *Belair, supra,* 47 Cal.3d 550, which held that ". . . when a public flood control improvement fails to function as intended, and properties historically subject to flooding are damaged as a proximate result thereof, plaintiffs' recovery in inverse condemnation requires proof that the failure was attributable to some unreasonable conduct on the part of the defendant public entities." (*Id.* at p. 567.) The court concluded *Belair* did not apply where damage to private property occurred as a result of a flood control project which, operating as intended, dammed water, "preventing its flowage across lower lands and pumping water upstream causing injury to the upper landowners." The court further determined that even if *Belair* applied, defendants would still be liable because they unreasonably placed a dam interfering with natural drainage, pumped water upstream and backed water up onto upstream neighbors without providing adequate methods for discharge of the water.

As to Strawberry Manor, the trial court found the *Belair* test applied and was met, in that it was unreasonable not to have a plan to close the gap in the levee in times of danger. "All entities assumed someone else would adequately sand bag or close the gaps by some appropriate means when it became necessary. To build a levee with such a gap in the middle without any plan to close the gap could only be described at best, as unreasonable and negligent conduct. An assumption that someone would close the gap is not a plan."

The statement of decision summarizes the court's conclusions as follows:

"In summary, the Court has found that the plaintiffs suffered damages to real and personal property caused by project[-]induced flooding which occurred in February 1986. Although the storm event was severe, it was

---

[6]The parties cite evidence the figure was $13.4 billion.

foreseeable with respect to the area in which plaintiffs were located. The storm event alone would not have caused the flooding of plaintiffs' properties but for the numerous combined effects of the public project.

"The facts are extensive but they lead to the inescapable conclusion that the combined effects of the [SRFCP] as constructed and maintained for the successful protection of others was a substantial concurring cause of the induced flooding. Principal among those causes and effects were:

"1. The natural drainage was dammed and diverted.

"2. The diversion successfully protected the lower landowners.

"3. The diversion flooded the upper owners.

"4. The defendants unreasonably failed to provide for proper discharge of the diverted water.

"5. Defendants failed to comply with the legal standards set for the construction and operation of the SRFCP by:

"a. Failing to provide freeboard[7] as required;

"b. Failing to adopt a proper plan for a flood fight as required . . . .

"This is not a case of 'failure to retain water within design capacity,' but rather a case where it was clearly foreseeable, if not actually foreseen, that if the project worked as designed it would induce flooding in an event of this sort, billions of dollars worth of property would be protected and plaintiffs' properties would be flooded as a consequence.

"Thus, in general the evidence has established more elements of liability for flooding than minimums that were set forth in *Belair* v. *Riverside . . . County Flood Control Dist.* (1988) 47 Cal.3d 550, in that:

"a. Actual physical injury to real and personal property was proximately caused by the public improvement as deliberately designed and constructed;

"b. The injury was foreseeable;

"c. If uncompensated, the plaintiffs would be required to contribute more than their proper share to the public undertaking and the loss inflicted

---

[7]"Freeboard" is an extra margin of safety to protect against errors in calculation and unknown factors.

upon them would not be distributed throughout the community as required by the constitutional provisions in inverse condemnation;

"d. Although the storm event was severe, there was a ' "substantial" cause and effect relationship which excludes the probability that other forces ALONE produced the injury';

"e. The project diverted waters that would not otherwise have crossed or damaged plaintiffs' property;

"f. The flooding did not result from a failure to provide the plaintiffs with the same degree of protection as provided to others . . . it resulted directly from the fact that protection was provided to others, thus the project increased the 'natural servitude.'

"In substance, the evidence conclusively shows that the defendants' joint 'design, construction, and maintenance of the flood control project . . . posed an unreasonable risk of harm to the plaintiffs, and such unreasonable design, construction and maintenance constituted a substantial cause of the plaintiffs' damages.' The plaintiffs were required to bear a disproportionate share of the cost of the public improvement."

The trial court found the state and RD 1000 jointly and severally liable for damages north of Sankey Road, and found all three defendants jointly and severally liable for damages in the Rio Linda and Strawberry Manor areas.

Judgment for the representative plaintiffs awarded specific dollar amounts (1) to the representative plaintiffs north of Sankey Road as against the state and RD 1000, and (2) to the Rio Linda and Strawberry Manor representative plaintiffs as against all three defendants.

Defendants moved for a new trial on the grounds of insufficient evidence and also moved to vacate judgment. Since Judge Fields, who conducted the trial, had retired and was unavailable, the matter was heard by Judge Ford. Not having heard the extensive trial evidence (which comprises more than 7,000 pages of reporter's transcript and more than 600 exhibits) and not even having the trial transcript available, Judge Ford stated he was not in a position to make an informed decision and therefore declined to act during the statutory period, thereby effectuating a denial of the motions as a matter of law.[8] Defendants appeal from the judgment.

---

[8]Accordingly, defendants' reliance on the judge's comments questioning the sufficiency of evidence is unavailing.

## Discussion

### I. *Belair's Reasonable Conduct Standard*

#### A. *Property Other Than Strawberry Manor*

■ Defendants contend the reasonable conduct standard of *Belair, supra,* 47 Cal.3d 550, applies to all flood control works cases, and even if it does not, there is no substantial evidence to support the judgment. With guidance from the Supreme Court's decision in *Bunch II, supra,* 15 Cal.4th 432, we shall conclude, with respect to the property other than Strawberry Manor (i.e., the property in Rio Linda and north of Sankey Road), that the reasonable conduct standard applies only if plaintiffs' properties were historically subject to flooding in the absence of the flood control works at issue, and we shall remand for the trial court to make a finding on that issue.[9]

##### 1. *Does the Belair Standard Apply?*

California Constitution, article I, section 19 (hereafter section 19) provides in part: "Private property may be taken or damaged for public use only when just compensation . . . has first been paid . . . ."

■ "When there is incidental damage to private property caused by governmental action, but the governmental entity has not reimbursed the owner, a suit in 'inverse condemnation' may be brought to recover monetary damages for any 'special injury,' i.e., one not shared in common by the general public." (*Locklin* v. *City of Lafayette, supra,* (1994) 7 Cal.4th 327, 362 (*Locklin*).)

■ The central issue in this case involves whether these rules must be applied in accordance with the reasonableness standard enunciated in *Belair,*

---

[9] The trial court found, and the parties do not dispute, that *Belair* applies to the system failure in Strawberry Manor, which we will discuss separately, *post.*

We note defendants' briefs contain arguments lacking factual and/or legal analysis. Where an appellant asserts a point in a brief without factual or legal support, it is deemed to be without foundation and requires no discussion by the reviewing court. (E.g., *Atchley* v. *City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72].) This is particularly so in a case of this magnitude—with more than 7,000 pages of reporter's transcript, 7,000 pages of clerk's transcript, hundreds of exhibits and 330 pages of appellate briefs. We may also disregard arguments that do not comply with California Rules of Court, rule 15(a), which requires separate headings for each point. (See *Farr* v. *Bramblett* (1955) 132 Cal.App.2d 36, 47 [281 P.2d 372]; *Superior Sand Co.* v. *Smith* (1937) 19 Cal.App.2d 166 [64 P.2d 1149].)

Finally, we disregard new arguments made for the first time in the reply briefs (*Neighbours* v. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788]), such as RD 1000's argument that this was one-time damage, and that one-time damage cannot form the basis for an inverse condemnation claim.

*supra,* 47 Cal.3d 550. Defendants claim plaintiffs must show unreasonable conduct by defendants in order to recover in inverse condemnation.[10] We shall conclude plaintiffs need not prove unreasonable conduct by defendants if the public works, operating as intended, diverted water to properties which were not historically subject to flooding—a circumstance which *Belair* and *Bunch II* expressly declined to address. We shall conclude traditional principles of inverse condemnation would support imposition of liability in such a case without requiring plaintiffs to prove unreasonable conduct by the defendants, and we shall remand for the trial court to make a finding on the issue whether plaintiffs properties were historically subject to flooding in the absence of the flood control works at issue.

### a. *Belair*

In *Belair*, landowners brought inverse condemnation actions against a public flood control district and the state for property damage when a levee gave way after several days of heavy storms. The project was designed to prevent river waters from escaping and flooding a particular area of land which had historically been subject to flooding. (*Belair, supra,* 47 Cal.3d at p. 557.) The plaintiffs' properties were located within that area. (*Id.* at p. 556.) At the time of the flooding, the water flow in the river did not exceed the levee's design capacity. (*Ibid.*) The plaintiffs' damages did not result from an overflow of the river but rather from a failure in a portion of the project levee, by reason of a breach at a particular point in the levee which allowed the channel waters to escape the river channel and flow onto the plaintiffs' properties. (*Ibid.*) The breach was caused by the undermining or erosion of the levee foundation, which in turn was caused in part by the

---

[10]Plaintiffs argue this lawsuit was filed before *Belair* was decided, and *Belair* should not apply retroactively. However, we agree with *Bunch v. Coachella Valley Water Dist.* (1989) 214 Cal.App.3d 203, 216 [262 Cal.Rptr. 513] (hereafter *Bunch I*), that there is no reason to except this type of case from the general rule of retroactive application of judicial opinions. Moreover, we note *Belair* was decided before the trial of this case, and therefore *Belair* was extensively briefed and litigated at trial.

*Belair* was decided under the state Constitution. The statement of decision in this case makes no mention of the federal Constitution. Plaintiffs nevertheless argue the judgment may be sustained under the Fifth Amendment of the federal Constitution (which was pled in the complaint), because we must infer the trial court found for plaintiffs under the federal Constitution, and defendants' silence on this issue in their opening briefs assertedly constitutes a concession that the judgment is sustainable on federal grounds. In their reply briefs, the state and RD 1000 oppose consideration of the federal Constitution.

We decline to sustain the judgment on federal grounds. Plaintiffs fail to state what findings they wish us to infer under the federal standard. They provide no analysis of the elements needed to prove a taking under the federal Constitution, nor do they show the federal Constitution affords landowners greater protection than the state Constitution. Plaintiffs merely cite three federal cases in a footnote, with bracketed summaries which have no apparent relation to the present controversy.

presence of two nearby levees not owned or operated by the defendant district. (*Belair, supra,* 47 Cal.3d at pp. 555-556.) The configuration of the three levees forced channel waters to flow against the district's levee at an angle which caused erosion and undermining of the levee toe. (*Id.* at p. 556.)

*Belair* held the plaintiffs could not recover in inverse condemnation under the California Constitution, because they had not adduced evidence that the flooding was the result of any unreasonable act or omission attributable to the defendants. (*Belair, supra,* 47 Cal.3d at p. 567.)

The *Belair* court explained its reasoning as follows.[11]

Before 1965, courts analyzed inverse condemnation liability by analogy to tort and property law principles, an approach predicated in part on the general understanding that inverse condemnation liability was limited to cases in which a private party would be held liable for injury to property under like circumstances. (*Belair, supra,* 47 Cal.3d at p. 562.)

That general understanding changed with *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129], which "shifted the focus in inverse condemnation cases from the common law to the Constitution." (*Belair, supra,* 47 Cal.3d at p. 562.) *Albers,* a case involving a landslide caused by county road construction, " 'rejected the notion that there need be a congruence between public and private liability in inverse condemnation actions.' "[12] (*Belair, supra,* 47 Cal.3d at pp. 562-563.) The critical issue is not whether the plaintiff would have a cause of action under tort or property law if damage were inflicted by a private person but rather whether the plaintiff should recover as a matter of interpretation and policy under section 19 (formerly section 14). (*Belair, supra,* 47 Cal.3d at p. 563,

[11]*Locklin, supra,* 7 Cal.4th 327, covered much of the same inverse condemnation background, in a case involving claims of landslide damage caused by erosion of creek banks attributed to public improvements that increased surface runoff, overburdening the storm drainage system. (*Id.* at pp. 339-340.) *Locklin* held the privilege to use a natural watercourse for drainage of surface waters from improved public property and to make storm drainage improvements was a conditional, not an absolute privilege. (*Id.* at pp. 362-367.) Therefore, public entities could be held liable but only if they acted unreasonably. (*Id.* at p. 366.) We note *Locklin* involved damage to downstream owners, who were already subject to surface water runoff, unlike the instant case where defendants arguably created a risk to which plaintiffs' properties were not subject in the absence of the flood control works.

[12]The Supreme Court has more recently said the constitutional provision was originally construed as providing a broader right of recovery against a government entity for damage to private property than that available in an action against a private party, except in the "arcane world of water law [where] the theory prevailed that if a private party had the right to inflict the damage, the government could assert the same immunity." (*Locklin, supra,* 7 Cal.4th at p. 362.) *Locklin* acknowledged *Albers* was not a water law case but described *Albers* as "giv[ing] new life" to the original construction. (*Locklin, supra,* 7 Cal.4th at p. 364.)

citing *Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250 and *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296 [90 Cal.Rptr. 345, 475 P.2d 441] (*Holtz*).) Under the fundamental policy basis of the constitutional requirement of just compensation, " ' "[t]he decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking." In other words, the underlying purpose of our constitutional provision in inverse—as well as ordinary—condemnation is "to distribute throughout the community the loss inflicted upon the individual . . . ." ' [Citation.]" (*Belair, supra,* 47 Cal.3d at p. 558.)

Thus, *Albers* held " 'any actual physical injury to real property proximately caused by the improvement as deliberately designed and constructed is compensable under article I, section [19], of our Constitution, whether foreseeable or not.' "[13] (*Belair, supra,* 47 Cal.3d at p. 563, citing *Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250.)

In so holding, however, *Albers* retained two exceptions to this general rule of strict liability. (*Belair, supra,* 47 Cal.3d at p. 563, citing *Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250.) One exception was the "*Archer* exception" (*Archer* v. *City of Los Angeles* (1941) 19 Cal.2d 19 [119 P.2d 1]), whereby government was not liable in inverse condemnation for activity which was "privileged" at common law, i.e., where the public entity had a common law right to inflict damage. (*Belair, supra,* 47 Cal.3d at p. 563.) The " 'doctrine of the common law "right to inflict damage," emanating from the complex and unique province of water law, has been employed in only a few restricted situations, generally for the purpose of permitting a landowner to take reasonable action to protect his own property from external hazards such as floodwaters.' . . . Frequently referred to as the 'common enemy' doctrine, the notion is that the owner of land subject to flooding has the right to erect defensive barriers and that any injury caused thereby to lower landowners as the result of the increased discharge or velocity of water is considered *damnum absque injuria* [a noncompensable loss]." (*Belair, supra,* 47 Cal.3d at p. 564, italics omitted.) "The unique legal privilege which cloaks such protective measures undoubtedly reflects the overriding interest, in a developing economy, of making land freely available for settlement and improvement." (*Ibid.*, fn. omitted.) Thus, the 1879 addition of the word "damaged" to the constitutional provision did not give a right of action for

---

[13]In *Belair* the Supreme Court refined the "proximate cause" element, noting *Albers* "contained the seeds of confusion through its combination of 'proximate cause' terminology with the elimination of foreseeability as an element of inverse condemnation." (*Belair, supra,* 47 Cal.3d at p. 559.) The causation element is restated with greater precision in terms of "substantial causation." (*Ibid.*, citing Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 436.)

damages which theretofore were *damnum absque injuria.* (*Locklin, supra,* 7 Cal.4th at p. 363.)

*Archer* itself held lower landowners could not recover for injury to land caused by public improvements (straightening, widening and deepening) to an upstream channel to improve drainage, even though the improvements increased the flow of water into a lagoon with no expansion of the outlet from the lagoon to the sea. (*Archer* v. *City of Los Angeles, supra,* 19 Cal.2d at pp. 22-25.)

The other exception to the general rule of strict liability involved exercise of the police power, which in the context of a direct taking or damaging of property applies " 'only under "emergency" conditions; i.e., when damage to private property is inflicted by government "under the pressure of public necessity and to avert impending peril," ' " e.g., demolition of a building to prevent the spread of conflagration.[14] (*Belair, supra,* 47 Cal.3d at p. 563, fn. 3.)

In these two types of circumstances, " 'the urgency or particular importance of the governmental conduct involved was so overriding that considerations of public policy inveighed against a rule rendering the public entity liable absent fault.' " (*Belair, supra,* 47 Cal.3d at p. 563, citing *Holtz, supra,* 3 Cal.3d at pp. 304-305.)

However, *Belair* further explained the *Archer* exception did not leave public entities with unqualified immunity. (*Belair, supra,* 47 Cal.3d at p. 564.) "Different policy considerations . . . inform the public and the private spheres. While 'certain socially beneficial conduct may appropriately be designated "privileged" for *private* individuals in order that they will not be deterred from undertaking the activity, the *public* entity may continue to engage in this same "privileged" activity even if it must bear the loss of the resulting damages.' [Citation.]" (*Belair, supra,* 47 Cal.3d at p. 564, original italics.) "Thus, while [the Supreme Court] recognized in *Albers* that strict inverse condemnation liability may not be appropriate in the case of flood control improvements, [the Court] emphasized in *Holtz* that such improvements should not be cloaked with the same immunity as private flood control measures." (*Belair, supra,* 47 Cal.3d at p. 564.)

The proper standard to be applied in such cases, said the *Belair* court, is that a public entity engaged in "privileged" activity will not be liable in

[14]*Belair* was not decided on the basis of police powers. The police power comes into play in connection with direct taking or damaging of property only when action is taken under emergency conditions, to avert impending peril. (*Customer Co.* v. *City of Sacramento* (1995) 10 Cal.4th 368, 384 [41 Cal.Rptr.2d 658, 895 P.2d 900].) Here, defendants do not assert their actions were an exercise of police power.

inverse condemnation, but only if it has acted reasonably. (*Belair, supra,* 47 Cal.3d at p. 565.) Thus, "[o]n the one hand, a public agency that undertakes to construct or operate a flood control project clearly must not be made the absolute insurer of those lands provided protection. On the other hand, the damage potential of a defective public flood control project is clearly enormous. Therefore, . . . the courts have consistently held that 'even when a public agency is engaged in such "privileged activity" as the construction of barriers to protect against floodwaters, *it must at least act reasonably and non-negligently. . . .'* [Citations.]" (*Belair, supra,* 47 Cal.3d at p. 565, original italics.) "The reasonableness of the public agency's conduct must be determined on the facts of each individual case, taking into consideration the public benefit and the private damages in each instance." (*Id.* at p. 566.)[15]

*Belair* did not hold that *all* flood control activity is privileged, and the Supreme Court expressly declined to decide any question of inverse condemnation liability for nonprivileged activity. (*Belair, supra,* 47 Cal.3d at p. 567.) Thus, in discussing the "common enemy" doctrine as involving privileged activity, the court observed: "The common law privilege, however, does not permit a property owner to obstruct or divert a stream from its natural channel (*Clement* v. *State Reclamation Board* [(1950)] 35 Cal.2d [628,] 635-636; [citation]), or to collect and discharge surface waters so as to increase the natural servitude. (*Shaw* v. *Sebastopol* (1911) 159 Cal. 623, 624 . . . ; *Granone* v. *County of Los Angeles* [(1965)] 231 Cal.App.2d [629,] 646; [citation].)" (*Belair, supra,* 47 Cal.3d at p. 564, fn. 4.) Later in its discussion, the *Belair* court stated: "[T]he 'common enemy' doctrine did not confer the right to divert or obstruct waters from their natural channels or drainages, and several pre- as well as post-*Albers* decisions, relying on this principle, appear to have endorsed a rule of inverse liability without fault where such diversions were present. (See, e.g., *Youngblood* v. *Los Angeles County Flood Control Dist.* [(1961)] 56 Cal.2d [603,] 607 ['When waters are diverted by a public improvement from a natural watercourse onto adjoining lands the agency is liable for the damage . . . even though no negligence could be attributed to the installation of the improvement.']; see also *Yee* v. *City of Sausalito* [(1983)] 141 Cal.App.3d [917,] 920-923.) [¶] We need not examine the validity of these decisions here, for there was no evidence presented that the District levee affirmatively diverted or burdened plaintiffs' property with floodwaters in excess of those which would have escaped

---

[15]The Supreme Court has more recently characterized *Belair* as eliminating the *Archer* exception. "*Belair* thus signalled not the continuation of the *Archer* exception, but its demise. It survived only vestigally in the limitation of inverse condemnation liability for public flood control projects in natural watercourses to damage resulting from a public entity's *unreasonable* conduct. Thereafter, a public agency that acted unreasonably in regard to its use or alteration of a natural watercourse might be liable in inverse condemnation for downstream damage." (*Locklin, supra,* 7 Cal.4th at p. 366.)

in the absence of the levee. . . . It is sufficient for our purposes here to hold that when a public flood control improvement fails to function as intended, and properties historically subject to flooding are damaged as a proximate result thereof, plaintiffs' recovery in inverse condemnation requires proof that the failure was attributable to some unreasonable conduct on the part of the defendant public entities." (*Belair, supra,* 47 Cal.3d at pp. 566-567, fn. omitted.)

After stating it need not decide the validity of the diversion cases, the *Belair* court said: "It is doubtful, however, whether evidence of an unintended 'diversion'—an elusive concept to begin with (see Van Alstyne [*Inverse Condemnation: Unintended Physical Damage* (1969)] 20 Hastings L.J. [431,] 460-461)—would elevate the test of inverse condemnation liability to absolute liability, rather than a reasonableness standard. As earlier discussed, the purposes of the Constitution, rather than the rules 'emanating from the complex and unique province of water law,' must fix the extent of a public entity's responsibility."[16] (*Belair, supra,* 47 Cal.3d at p. 567.)

*Belair* did not decide whether a reasonableness test applies in cases where there is a nonprivileged affirmative diversion. The Supreme Court said the case before the court was not a diversion case because the trial court found, and the evidence demonstrated, that the plaintiffs "were subject to periodic flooding before the levee was constructed, and that the levee did not 'increase the risk of damage or impose any easement, servitude, or other burdens on plaintiffs' property.' " (*Belair, supra,* 47 Cal.3d at p. 567, fn. 8.)

### b. *Bunch II*

In our original opinion in this case, we held *Belair* did not apply to plaintiffs' properties (other than Strawberry Manor, which we discuss separately, *post*). The Supreme Court granted review and subsequently transferred this case back to us for reconsideration in light of *Bunch II, supra,* 15 Cal.4th 432.

---

[16]The Van Alstyne article cited by the *Belair* court states: "The necessity for the pleading and proof of fault in the obstruction cases, while no fault is required for liability in the diversion cases, has caused a certain amount of confusion in the California case law. It is obvious that many kinds of stream obstructions may cause a diversion of stream waters, and, conversely, diversion normally requires an obstruction of some kind. Whether fault must be shown by the injured property owner thus depends, to some extent, upon how the facts are classified. A deliberate program intended to alter the course of a stream for a public purpose is ordinarily treated under the 'diversion' rubric, while unintended flooding is usually attributed to a negligently planned project that creates an 'obstruction.' The distinction, however, is not a sharply defined one, and plaintiffs have sometimes sought recovery alternatively on both theories while pleading the same facts." (Van Alstyne, *Inverse Condemnation: Unintended Physical Damage, supra,* 20 Hastings L.J. at pp. 460-461, fns. omitted.)

*Bunch II* addressed the question "whether the reasonableness rule developed in the context of flood control improvements along natural watercourses should apply to cases in which a public entity diverts and rechannels water under a flood control system of dikes and levees that fail in a severe rainstorm, causing damage to properties historically subject to flooding." (15 Cal.4th at p. 447.) The Supreme Court concluded it should. (*Ibid.*)

In *Bunch II*, property owners brought an inverse condemnation action against a local water district, seeking compensation for flood damage to their property suffered when the district's project to divert water from a potentially dangerous natural watercourse failed in a severe storm. The trial court found the district had acted reasonably and entered judgment in favor of the district. The Supreme Court upheld the judgment, holding that in the context of flood control improvements along natural watercourses in which a public entity diverts and rechannels water under a flood control system of dikes and levees that fail in a severe rainstorm, causing damage to properties historically subject to flooding, the standard to assess liability is the reasonableness of the public entity's conduct, rather than a strict liability standard. This conclusion avoided discouraging beneficial flood control improvements, while compensating losses unfairly incurred. The failure of flood control improvements to protect property adequately against historic periodic flooding should rest not on antiquated notions of fault or common law labels defining the type of waters requiring flood control measures, but rather on the balancing of interests that the state Constitution requires. (*Bunch II, supra*, 15 Cal.4th at p. 451.) The evidence supported the trial court's finding that the water district had acted reasonably.

*Bunch II* stated: "*Belair*'s dictum [doubting whether an unintended diversion would trigger strict liability] indicates that the court believed its analysis could apply to all flood control cases involving unintended property damage. Nonetheless, our reluctance to extend *Belair* beyond its facts is the basis for the Bunches' assertion that the case has limited application, an argument aided, in some respects, by *Belair*'s invocation of tort concepts of 'intent' in a case addressing a public entity's inverse condemnation liability under section 19. The Bunches also rely on *Locklin*'s observation that *Belair* involved an activity formerly 'privileged under the *Archer* doctrine.' [Citations.]

"[H]owever, *Belair*'s policy reasons for imposing a reasonableness rule in common enemy cases—to avoid discouraging beneficial flood control improvements, while compensating losses unfairly incurred—extend logically to all cases involving flood control improvements affecting property historically subject to flooding, without regard to whether the activity was privileged at common law. A constitutional analysis for determining inverse

condemnation liability in the flood control context should not include 'a fruitless search for the somewhat artificial moral elements inherent in the tort concepts of negligence and intentional wrongs.' [Citations.] As Professor Van Alstyne recognized, '. . . it is arguable that strict liability for damage resulting from the diversion of water flowing in a natural watercourse may be reasonably sensible as applied to adjoining riparian owners; a contrary view would expose settled reliance interests to the threat of repeated and diverse private interferences that could discourage natural resource development. Stream diversions, however, may be integral features of coordinated flood control, water conservation, land reclamation, or agricultural irrigation projects undertaken on a large scale by public entities organized for that very purpose. Where this is so, the community may suffer more by general fiscal deterrents resulting from indiscriminately imposed strict liabilities than by specifically limited liabilit[i]es determined by the reasonableness of the risk assumptions underlying each diversion.' [Citation.]" (*Bunch II, supra,* 15 Cal.4th at pp. 448-449, citing Van Alstyne *Inverse Condemnation: Unintended Physical Damage, supra,* 20 Hastings L.J. at pp. 495, 502.)

*Bunch II* further stated "nothing in *Locklin* or its progeny precludes application of *Belair*'s reasonableness rule to cases involving the failure of flood control measures designed to divert potentially dangerous natural water flow.[17] Pre-*Belair* cases considering inverse condemnation liability under the just compensation clause addressed whether owners of damaged property would contribute more than their proper share to the public undertaking if not compensated for the damage. [Citations.] In light of *Belair* and *Locklin,* this principle is balanced by the possibility that imposing open-ended liability on public entities charged with creating and maintaining flood control improvements will discourage the development of needed public works. [Citation.]

"As Professor Van Alstyne explained, 'Plan or design characteristics that incorporate the probability of property damage under predictable circumstances may later be judicially described as "negligently" drawn; yet, in the original planning process, the plan or design with its known inherent risks may have been approved by responsible public officers as being adequate and acceptable for non-legal reasons. For example, the damage, although foreseeable, may have been estimated at a low order of probability, frequency, and magnitude, while the added cost of incorporating minimal

---

[17]*Bunch II* said *Locklin* held *Belair*'s rule with respect to flood control projects and the "common enemy" doctrine had "broader application to cases in which a public entity deliberately drained excess surface water into a natural watercourse, which eventually caused damage to downstream property." (*Bunch II, supra,* 15 Cal.4th at p. 444.)

safeguards may have been unacceptably high in proportion to available manpower, time and budget. . . . The governmental decision . . . to proceed with the project under these conditions thus may have represented a rational (and hence by definition non-negligent) balancing of risk against practicability of risk avoidance.' [Citation.]

"Thus, the placement, design, and construction of even the most effective system inherently involve a complex balancing of interests and risks. Whatever choice the responsible agency makes will necessarily affect the patterns of flooding in the event the project fails, and will almost certainly increase certain risks in order to reduce others. The dangers posed to individual lands by the failure of any public flood control project are 'potentially enormous' and sometimes deserve compensation. However, strict and 'open-ended' liability for the failure of a project whose overall design, construction, operation, and maintenance was 'reasonable' would unduly deter the development of these vital bulwarks against common disaster. [Citation.]" (*Bunch II, supra*, 15 Cal.4th at pp. 449-450.)

*Bunch II* concluded: "In the context of inverse condemnation, therefore, a flood control agency does not necessarily exact 'disproportionate,' and thus compensable, contributions from particular landowners simply because it constructs adjacent flood control improvements that may alter how floodwaters will affect those landowners if the improvements fail to contain the flow. When a public flood control system fails to protect land from historic periodic flooding, the only way to determine whether a damaged private landowner has thereby been forced to contribute a compensable 'disproportionate' share of the public undertaking is to determine whether the system, as designed, constructed, operated, and maintained, exposed him to an 'unreasonable' risk of harm, either individually or in relation to other landowners.

"Therefore, when a public flood control improvement designed to divert or rechannel potentially dangerous water flow is a substantial cause of property damage, courts must balance ' "public need against the gravity of private harm" ' in determining whether to compensate the landowners for that damage. [Citation.] In balancing these interests, courts must weigh the factors set forth in *Locklin, supra*, 7 Cal.4th at pages 368-369.[18] [Citation.] We derive from *Belair*, and from the *Locklin* factors applying its rule, the

[18]*Bunch II* apparently refers to *Locklin*'s reference to the following factors proposed by Professor Van Alstyne: " '(1) The overall public purpose being served by the improvement project; (2) the degree to which the plaintiff's loss is offset by reciprocal benefits; (3) the availability to the public entity of feasible alternatives with lower risks; (4) the severity of the plaintiff's damage in relation to risk-bearing capabilities; (5) the extent to which damage of the kind the plaintiff sustained is generally considered as a normal risk of land ownership; and

principle that compensation in cases involving the failure of flood control improvements to protect property adequately against historic periodic flooding should rest not on antiquated notions of fault, or common law labels defining the type of waters requiring flood control measures, but rather on the balancing of interests that section 19 requires. This balancing of interests serves both the private sector and public improvement efforts by addressing the cost-spreading objective of the just compensation clause while protecting public entities from unlimited, undeserved liability that could well inhibit further construction of public works." (*Bunch II, supra*, 15 Cal.4th at pp. 450-451.)

*Bunch II* concluded broadly: "The *Belair/Locklin* reasonableness test applies to cases involving public flood control works that cause physical damage to private property." (15 Cal.4th at p. 454.)

This broad statement of law was, however, qualified by a footnote in *Bunch II*, stating: "As in *Belair*, this case does not present, and we do not decide, the question whether the reasonableness standard applies when flood control measures cause flood damage to land that was not historically subject to flooding. (See *Belair, supra*, 47 Cal.3d at p. 565.) Of course, if the government, by works it constructs on its own property or elsewhere, diverts or dams natural waters, thereby *permanently* submerging previously dry

(6) the degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to the plaintiff.' " (*Bunch II, supra,* 15 Cal.4th at p. 446, citing *Locklin, supra*, 7 Cal.4th at pp. 368-369.) *Bunch II* also said: " '[R]easonableness in this context also considers the historic responsibility of riparian owners to protect their property from damage caused by the stream flow and to anticipate upstream development that may increase that flow. Keeping in mind the purpose of the constitutional right to compensation for damage caused by public works and improvements—that property owners contribute no more than their proper share to the public undertaking—plaintiff must demonstrate that the efforts of the public entity to prevent downstream damage were not reasonable in light of the potential for damage posed by the entity's conduct, the cost to the public entity of reasonable measures to avoid downstream damage, and the availability of and the cost to the downstream owner of means of protecting that property from damage.' " (15 Cal.4th at p. 446, citing *Locklin, supra*, 7 Cal.4th at p. 369.)

*Locklin* also referred to factors identified in a prior Supreme Court decision—(1) the damage, if reasonably foreseeable, would have entitled the property owners to compensation; (2) the likelihood of public works not being engaged in because of unseen and unforeseeable possible direct physical damage to real property is remote; (3) the property owners suffered direct physical damage to property as a result of the work as deliberately planned and carried out; (4) the cost of such damage can better be absorbed, and with less hardship, by the taxpayers as a whole than by the individual property owners; and (5) the owner if uncompensated would contribute more than his proper share of the public undertaking. (*Locklin, supra*, 7 Cal.4th at p. 368, citing *Albers* v. *County of Los Angeles, supra*, 62 Cal.2d at p. 263.) *Locklin, supra*, 7 Cal.4th at page 368, also referred to *Keys* v. *Romley* (1966) 64 Cal.2d 396 [50 Cal.Rptr. 273, 412 P.2d 529], as identifying basic requirements of reasonableness. We assume all of the foregoing factors could be properly considered.

private land in order to provide benefits to the public at large, a compensable direct 'taking' of the submerged land may occur no matter how 'reasonable' the government's conduct. Moreover, cases under the federal Constitution have held that a 'taking' may occur when a government dam or flood control project subjects certain previously dry lands to inundation that is less than permanent, but is frequent and inevitably recurring.[19] (*Barnes* v. *United States* (1976) 538 F.2d 865, 870 [210 Ct.Cl. 467], and cases cited.)" (*Bunch II, supra,* 15 Cal.4th at p. 436, fn. 1, original italics.)

### c. *Our Reconsideration in Light of Bunch II*

This case poses the question left open in *Bunch II*, whether the reasonableness standard applies where public flood control works, operating as intended, flood property which was not historically subject to flooding. Plaintiffs contend their parcels were not historically subject to flooding. Defendants claim they were. We shall conclude that if plaintiffs' properties were not historically subject to flooding, then the reasonableness standard is inapplicable. Thus, plaintiffs would not be required to prove unreasonable conduct by defendants in order to prevail in their inverse condemnation claim. We shall further conclude the trial court made no finding on this issue. We shall therefore reverse the judgment and remand to the trial court to make a finding as to whether plaintiffs' properties were historically subject to flooding in the absence of the flood control works at issue.[20] If the trial court finds plaintiffs' properties were not historically subject to flooding, the court should conclude the reasonableness test is inapplicable. In that

[19]As we discuss, *post,* we do not read *Bunch II* to mean flooding must be permanent or frequent and inevitably recurring in order to support an inverse condemnation claim (and/or liability without proof of unreasonable conduct) under the California Constitution.

[20]Amicus curiae Delta Protection Commission suggests the appropriate frame of reference for determining whether property was historically subject to flooding may be the early 1800's—when the property was in a state of nature before the influx of settlers who gradually altered the topography and hydrology of the area. We believe, however, that the appropriate frame of reference is not simply a temporal benchmark but rather whether the property was historically subject to flooding in the absence of the flood control works at issue in the case. Thus, "*Belair* involved the construction of public levees along a natural drainage course in an attempt to prevent flooding in an area historically subject to it." (*Bunch II, supra,* 15 Cal.4th at p. 442.) "[C]ompensation in cases involving the failure of flood control improvements to protect property adequately against historic periodic flooding should rest not on antiquated notions of fault, or common law labels . . . but rather on the balancing of interests that section 19 requires." (*Bunch II, supra,* 15 Cal.4th at p. 451.) "When a public flood control system fails to protect land from historic periodic flooding, the only way to determine whether a damaged private landowner has thereby been forced to contribute a compensable 'disproportionate' share of the public undertaking is to determine whether the system, as designed, constructed, operated, and maintained, exposed him to an 'unreasonable' risk of harm . . . ." (*Id.* at p. 450.) Thus, the inquiry of historical flooding relates not simply to any particular moment frozen in time but to the impact of the public works on the private property.

case, defendants would be liable, without proof they acted unreasonably, for an intentional diversion using private property as a retention basin, when that property was not historically subject to flooding. If the trial court finds plaintiffs' properties were historically subject to flooding, the court must use the reasonableness standard, applying the *Locklin* factors.

We shall further conclude that, since *Locklin* was not yet decided at the time of the trial court's original decision in this case, we are not confident the trial court considered the *Locklin* factors in making its alternate finding that defendants would be liable even under *Belair*'s reasonableness standard. We shall leave it to the trial court to decide whether to allow the parties to introduce new evidence on the question whether plaintiffs' properties were historically subject to flooding.

### The Reasonableness Standard Does Not Apply to Intentional Diversions to Property Not Historically Subject to Flooding

" ' "The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking." In other words, the underlying purpose of our constitutional provision in inverse—as well as ordinary—condemnation is "to distribute throughout the community the loss inflicted upon the individual . . . ." ' [Citation.]" (*Belair, supra,* 47 Cal.3d at p. 558.)

Using private property not historically subject to flooding as a retention basin to provide flood protection to other property exacts from those owners whose properties are flooded a contribution in excess of their proper share to the public undertaking. We see no reason to put such property owners to the task of proving the governmental entities acted unreasonably in order for the owners to recover in inverse condemnation.

*Bunch II* and *Belair* involved project *failures*, unlike the instant case where the issue is an intentional use of private property as a retention basin to protect other property.[21] *Bunch II* said when a flood control system fails, the only way to determine whether a damaged landowner has been forced to

---

[21]We recognize *Locklin, supra,* 7 Cal.4th 327, which involved creekbed erosion caused by an increased discharge of surface waters, does not appear to have involved a project *failure*, yet the Supreme Court applied a reasonableness standard. Nevertheless, as we have noted, the plaintiffs in *Locklin* were downstream landowners who were already subject to surface water runoff. Here, plaintiffs' properties arguably were not historically subject to flooding, and thus *Locklin* is distinguishable on that basis. Moreover, *Locklin* involved privileged activity. (E.g., 7 Cal.4th at p. 367 ["Because a public agency, like any riparian property owner, engages in a privileged activity when it drains surface water into a natural watercourse . . . , section 19 . . . mandates compensation only if the agency exceeds the privilege by acting

contribute a disproportionate share of the public undertaking is to determine whether the system, as designed, constructed, operated and maintained, exposed him to an unreasonable risk of harm. (*Bunch II, supra,* 15 Cal.4th at p. 450.) This recognizes flood control works may alter the risks created by nature. (*Ibid.*)

However, where property is damaged by a risk created by the public works, rather than nature, we do not believe application of a reasonableness standard is the only way to determine whether the owner of the damaged property has been forced to contribute a disproportionate share of the public undertaking. Thus, we see no reason to apply the reasonableness standard.

The importance of flood control never conferred on the government a privilege to use private property which was not historically subject to flooding as a retention basin in order to protect other property, without paying compensation.[22] We do not read *Belair, Locklin, or Bunch II* as compelling that result. Such public works would go beyond the mere alteration of risks inherent in all flood control projects, and we see no reason to apply a "reasonable conduct" standard to the resulting damage.[23]

It is antithetical to the precepts of the Constitution to allow the government affirmatively to burden private property not historically subject to flooding in order to save other property from flooding, and expect the damaged property owner to absorb the loss. Most crucially, if the government intentionally diverts water to upstream private property which was not historically subject to flooding, using that property as a retention basin in order to protect lower-lying land, imposition of inverse condemnation liability is fair. Our conclusion is not based on any arcane distinctions peculiar to water law but rather on commonsense application of inverse condemnation principles.

---

unreasonably"].) The privilege addressed in *Locklin* is about downstream damage caused by upstream owners. (E.g., *Locklin, supra,* 7 Cal.4th at p. 351 [purpose of natural watercourse rule is to facilitate development of upstream properties]; *id.* at pp. 366-367 [natural watercourse privilege must be conditioned upon reasonable conduct in order to avoid disproportionate burden on downstream owners].) Certainly, *Locklin* said the downstream plaintiffs also had to act reasonably to protect themselves from the effects of upstream development. (7 Cal.4th at p. 369.) However, we see nothing in *Locklin* which would impose a reasonableness standard in the absence of a privilege. Here, no privilege allows public entities to use private property not historically subject to flooding as a retention basin to protect other property from flooding.

[22]We note some evidence indicates the property was not previously subject to flooding "from that source," i.e., from downstream. This evidence is not sufficient. Plaintiffs must show the property was not historically subject to flooding, period, regardless of where the water came from.

[23]Alternatively, it could be said that it is unreasonable as a matter of law for flood control agencies to create a risk of flooding upstream property, which would not be subject to such flooding, in order to protect other property, without paying compensation.

Here, the injury was caused by public improvements " 'as deliberately designed and constructed.' " (*Belair, supra,* 47 Cal.3d at p. 558.) " ' "The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking." In other words, the underlying purpose of our constitutional provision in inverse . . . condemnation is "to distribute throughout the community the loss inflicted upon the individual . . . ." ' " (*Ibid.*)

Here the public undertaking (in effect using plaintiffs' land as a temporary retention basin) successfully averted billions of dollars of property loss to other property. Under the circumstances of this case, if plaintiffs' properties were not historically subject to flooding, they should not be expected to bear their loss alone.

Defendants argue the reasonableness test should apply in all inverse condemnation cases involving flood control projects.[24] They quote *Belair*'s language that ". . . a public agency that undertakes to construct or operate a flood control project clearly must not be made the absolute insurer of those lands provided protection."[25] (*Belair, supra,* 47 Cal.3d at p. 565.) However, government entities are not made absolute insurers if they are required to compensate for an intentional diversion pumping water upstream to private property not historically subject to flooding and using that property as a retention basin to protect other land.

We recognize *Bunch II* and other cases have expressed concern that public entities not be discouraged from engaging in flood control activities. We do not believe, however, that our conclusion will discourage public entities from engaging in flood control efforts. We see great value to applying a reasonableness standard in cases of a project failure. A public entity may be reluctant to assay the good deed of flood control efforts knowing it will be strictly liable if it fails. On the other hand, a public entity *should* be reluctant to make uncompensated use of private property not historically subject to

---

[24]At the original oral argument in this court, defendants State of California and RD 1000 agreed that if a public entity intentionally diverts floodwaters to private property, *Belair*'s reasonableness test does not apply.

[25]The dissenting opinion in *Belair* read the majority opinion as "intimat[ing]" that a qualified privilege would apply in all flood control cases. (*Belair, supra,* 47 Cal.3d at p. 572, fn. 1 (dis. opn. of Mosk, J.).) Defendants also cite dictum in a concurring opinion that "in *Belair* . . . we held that strict liability was not appropriate in an inverse condemnation action for property damaged by public flood control projects." (*Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202, 240 [285 Cal.Rptr. 99, 814 P.2d 1341] (conc. opn. of Baxter, J.) [tort action alleging rape by police officer].)

flooding as a retention basin in connection with successful flood control efforts to protect other property.[26]

We note that in a prior appeal in the *Bunch* saga, the Fourth District made a distinction between a "diversion from" and a "diversion to," and concluded the reasonableness standard should apply to all cases involving unintended physical damage to property caused by an unintended breach in flood control facilities, including cases where floodwaters were intentionally diverted from a natural channel. (*Bunch I, supra,* 214 Cal.App.3d 203.) However, *Bunch I* said in a footnote: "We do not wish to be understood, of course, as suggesting that *intentional* diversions of water *to* a particular place cannot give rise to inverse condemnation liability or that establishing that liability in such a case would require an inquiry into the reasonableness of the public agency's conduct. Such a diversion would result in intentional physical damage to property and would almost always give rise to governmental liability as a matter of course." (*Bunch I, supra,* 214 Cal.App.3d at p. 214, fn. 8, original italics.)

We agree with that statement in *Bunch I* and see nothing in *Bunch II* to undermine it, insofar as the diversion is to property not historically subject to flooding. *Bunch II* expressly left this question open. We see no reason to require a plaintiff in such a situation to prove the defendant acted unreasonably.

All defendants filed supplemental briefs with this court addressing the impact of *Bunch II* on this case. They argue the properties at issue in this case *were* historically subject to flooding (hence subject to the reasonableness standard). The state makes the bare assertion that even if plaintiffs' properties were not historically subject to flooding, the reasonableness standard would apply as long as the flooding was not permanent or frequently recurring. However, this bare assertion is unencumbered by any analysis whatsoever. (*Atchley* v. *City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72] [contention unsupported by legal analysis may be disregarded by reviewing court].) RD 1000 in its supplemental brief states it "agrees that if a public entity intentionally uses private property as a *permanent (or frequently and inevitably recurring)* detention basin for flood water, then the property owners may be entitled to compensation." RD 1000 thus concedes

---

[26]In its amicus curiae brief, Delta Protection Commission (DPC) laments the plight of land use agencies who get sued for disallowing private property development in floodplains and then get sued when the developed property gets flooded. DPC claims imposition of strict liability in this case would undermine the regulatory functions of land use agencies. However, no such issue is present in this case, and DPC fails to show how imposition of strict liability on flood control agencies which intentionally use private property as a retention basin to protect other property would undermine the regulatory functions of land use agencies.

liability subject to qualification but presents no authority or analysis supporting imposition of the qualification under the California Constitution.

Defendants also argue there is no evidence of permanent or frequent and inevitably recurring flooding. Although *Bunch II* said a "taking" under the federal Constitution may occur when government subjects previously dry lands to inundation that is permanent or frequent and inevitably recurring (*Bunch II, supra*, 15 Cal.4th at p. 436, fn. 1), we do not read *Bunch II* as imposing a requirement under the California Constitution that damage must be permanent or frequent and inevitably recurring. Defendants present no analysis supporting such a rule, which would contravene the express language of the California Constitution, which expressly provides that property may be "damaged" for public use only where just compensation has been paid.[27]

We thus conclude an intentional diversion of water which floods private property not historically subject to flooding subjects flood control agencies to inverse condemnation liability without proof of unreasonable conduct. We do not see this conclusion as imposing artificial distinctions or arcane water law principles. We see a difference between the type of situation present in cases such as *Belair* and *Bunch II* and the instant case. On the one hand is the type of situation where a public entity tries to protect private property owners from a risk created by nature and in doing so may alter the risks created by nature, but the public entity's efforts fail. On the other hand is a situation where government appropriates private property in order to protect other property, creating a risk which would not otherwise exist. We see no unfairness in applying a reasonableness standard to the first situation but not to the second.

## 2. *The Statement of Decision*

In light of *Bunch II*, we believe it is critical to determine whether plaintiffs' properties were historically subject to flooding. The trial court made no such finding. We therefore shall remand this case to the trial court for the limited purpose of making a finding on this issue. We leave it to the

---

[27]Moreover, we note that in our original opinion, we declined to address an issue raised for the first time in the reply briefs—a contention that this was a case of one-time damage, and one-time damage will not sustain an inverse condemnation claim. (See fn. 9, *ante.*) In their supplemental briefs, no defendant asks us to reconsider our refusal to consider this belatedly raised issue implicating factual as well as legal questions. Indeed, the state's supplemental brief appears to contradict any notion of one-time damage, because the state claims (in support of the argument that plaintiffs' properties were historically subject to flooding hence subject to a reasonableness test) that plaintiffs' properties were flooded several times during a time period which appears to postdate the construction of the back levee and/or the NEMD.

trial court to decide whether to allow the parties to adduce new evidence on this issue.[28]

If the trial court finds plaintiffs' properties were not historically subject to flooding, then *Belair*'s reasonableness standard does not apply, and the trial court's original decision is sustainable on the grounds there was an intentional diversion creating a risk of flooding in order to use private property as a retention basin to save other property.

If the trial court finds plaintiffs' properties were historically subject to flooding, plaintiffs must show defendants' conduct was unreasonable, under the *Locklin* factors, as stated in *Bunch II*. Since *Locklin* and *Bunch II* were not yet decided at the time of the trial court's decision in this case, we direct that on remand the trial court should make findings under the *Locklin* factors. We leave it to the trial court to decide whether to allow the parties to adduce new evidence on this issue.

In their supplemental briefs, defendants argue remand is not necessary. RD 1000 claims plaintiffs adduced no evidence of unreasonableness. However, RD 1000 fails to acknowledge evidence favorable to the trial court's alternate finding of unreasonableness. The state claims appellants "tried to place" the pertinent factors before the court in objections to the proposed statement of decision. However, the state fails to comply with California Rules of Court, (rule 15(a)), by failing to provide a proper citation to the record. Instead, the state cites an 87-page span of the record. Our scan of these pages shows numerous objections that have nothing to do with this issue, as well as a claim that the trial court did not explain what it meant by unreasonable. In any event, *Locklin* was not decided until after the trial court's decision in this case, and we are not confident the court applied a test comparable to the *Locklin* factors. (Cf. *Bunch II, supra*, 15 Cal.4th at p. 454 [remand not required where trial court used test comparable to *Locklin* factors].) We consider it appropriate to have the trial court apply the *Locklin* factors on remand.

■ We now dispose of defendants' other contentions concerning the statement of decision.

RD 1000 argues the trial court never made a finding that water was intentionally diverted *to* plaintiffs' properties. We will conclude the trial

---

[28]In our original opinion in this case, we made reference to the question whether the flood control works were designed to protect plaintiffs' properties. This may be a variation on the issue as phrased by *Bunch II*, as to whether the properties were historically subject to flooding, though the two issues do not necessarily overlap.

court, in accordance with Code of Civil Procedure section 632,[29] sufficiently explained the basis for its decision (other than the "historically subject to flooding" issue which necessitates remand).[30]

Thus, the statement of decision contains the following: "[T]he water backing up on plaintiffs' properties (other than those in Strawberry Manor) came from surface water and streams that had been diverted from normal courses by the construction and operation of the SRFCP as designed *and intended*." (Italics added.) Moreover, the court repeatedly found that the flood control works in February 1986 functioned as "intended," which read in context supports the conclusion that the trial court found defendants understood that plaintiffs' properties would be flooded. Additionally, the court said with respect to the land north of Dry Creek: "Here the project functioned precisely as it was intended and designed to function, and the project successfully protected lands within the American Basin. . . . This is nothing more than lower landowners damming the water and preventing its

---

[29]Code of Civil Procedure section 632 provides that "written findings of fact and conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial. . . ."

[30]The state believes the trial court found an intentional diversion but argues the project did not intentionally divert water onto plaintiffs' property.

ARFCD appears to concede the trial court found defendants intended to flood plaintiffs' properties but argues no evidence supports that finding. Thus, ARFCD begins its discussion: "The Trial Court ruled that all of [plaintiffs'] flood damages, with the exception of those [plaintiffs] living in Strawberry Manor, were intentionally caused by the Project." ARFCD then argues: "There is no evidence to support the Trial Court's finding that the Project was designed and constructed with the intent to flood [plaintiffs']." ARFCD then asserts it "requested the Trial Court to specify the basis for this and other findings in ARFCD's Request for Statement of Decision," but "no such references were provided in the Statement of Decision, as noted in ARFCD's Objections to Proposed Statement of Decision and Proposed Judgment." (Fns. omitted.) ARFCD cites Code of Civil Procedure section 634, which precludes an inference that the trial court found in favor of the prevailing party as to controverted issues upon which the statement of decision is silent or ambiguous, where the omission or ambiguity was brought to the trial court's attention.

It thus appears ARFCD complains the statement of decision was deficient not in failing to make unambiguous findings but in failing to cite evidence in support of the findings. However, in a statement of decision a statement of ultimate facts is sufficient; evidentiary facts are not required. (7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 411, p. 470.) Moreover, ". . . the trial court need not address each question listed in a party's request. All that is required is an explanation of the factual and legal basis for the court's decision regarding such principal controverted issues at trial as are listed in the request." (*Nunes Turfgrass, Inc.* v. *Vaughan-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1525 [246 Cal.Rptr. 823].) Here the statement of decision clearly explained the factual basis for the court's decision, including the facts that the public works created a hydraulic dam and backwater effect, and defendants had notice that these effects existed and subjected plaintiffs' land to flooding. The trial court also found defendants effectively appropriated plaintiffs' property as a temporary retention basin to protect other property.

flowage across lower lands and pumping water upstream causing injury to the upper landowners."

We conclude the statement of decision sufficiently establishes that the trial court found this was a case of intended diversion.

### 3. *Sufficiency of Evidence*

RD 1000 points out the public works were intended to divert water to the Sacramento and American Rivers and contends there is no substantial evidence the works were intended to divert water *to* plaintiffs' properties. ARFCD argues there "is no evidence to support the Trial Court's finding that the Project was designed and constructed with the intent to flood [plaintiffs'] properties or that it was foreseeable that such flooding would occur." [31] The state and ARFCD contend the flooding was unintentional. We shall conclude substantial evidence supports the judgment in this respect.

" 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' [Citations.]" (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) "[I]n examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding." (*Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].)

A substantial evidence challenge requires us to measure the evidence adduced at trial against rules of law. (*Null* v. *City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1534 [254 Cal.Rptr. 492].)

Here, an appropriate definition of "intention" is at issue. To be sure, there is no uniform agreement on what we mean by an "intentional" act.[32] However, a criterion of "intention" widely accepted in the civil law is set forth in section 8a of the Restatement Second of Torts. By that test,

---

[31]Despite this claim, ARFCD's brief contains admissions that the dangers were known.

[32]"The relationships of ends, means, causes and knowledge can vary considerably. Professor Kenny charts 16 possible relationships involving the circumstance in which an agent does A thereby causing B, five of which, involving the doing of A intentionally, are of interest here. (See Kenny, Intention and Purpose in Law, Essays in Legal Philosophy (1968) pp. 151-154.) '1. An agent knows he is doing A, wants to do A, knows that he is doing B by doing A, and wants to do B. . . . [¶] 2. The agent knows that he is doing A, knows that he is doing

"intent" "denotes not only those results the actor desires, but also those consequences which he knows are substantially certain to result from his conduct. [Citations.]" (*Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 922 [114 Cal.Rptr. 622, 523 P.2d 662].) In our view, this test describes what we ordinarily mean by "intention" and we shall adopt it here.

Measured by this test, the record contains substantial evidence of an intentional diversion, both before and after the 1956 completion of Folsom Dam.

Thus, studies and reports dating back to the early 1900's advised of the risk caused by the backwater effect of the NEMD. The 1910 Kieffer Report (which was later approved by RD 1000 and the state) stated: "A problem of the first magnitude in connection with this project is the control and disposition of the water delivered into the American Basin from the streams entering from the East." Kieffer warned a backwater effect could occur when high flows in tributary streams coincided with high flows in the Sacramento and American Rivers. Kieffer forecast the "flooding of a tremendous area of farming country not previously overflowed."

As plaintiffs' expert characterized it at trial, water that naturally ran into the Basin had to be discharged into the Sacramento and American Rivers in a different fashion so that the land protected by the back levee remained dry. However, that proved difficult. By intersecting the rivers, the Cross Canal and the NEMD allowed river water to enter those areas. Construction of the back levee and diversion of the waters from the east, coupled with the possibility of high flows in the Sacramento and American Rivers, potentially subjected land east of the NEMD to backwater flooding to which it had not previously been subjected.

In 1927, ARFCD was created for the specific purpose of protecting its territory from the known hydraulic dam and backwater effects.

In 1956, RD 1000 advised the state the federal government was refusing to assume responsibility for levees on the east side of the NEMD, and that if

B by doing A, and wants to do B, but does not want to do A . . . . [¶] 3. The agent knows he is doing A and wants to do A and knows he is doing B by doing A but does not want to do B. . . . [¶] 5. The agent knows that he is doing A and wants to do A and wants to do B, but though by doing A he is doing B he does not know this. . . . [¶] 9. The agent knows and wants himself to be doing A, but neither knows nor wants himself to be doing B by doing A.' In all of these cases it can be said that the agent intends to do A. The ordinary cases of doing A in order to do B, i.e., intending to use A as a means to B, are 1. and 2. Cases 3 and 5 subsume cases in which the common law ascribes an intent to do B to the agent. . . . Case 9 leads to the problems involving recklessness." (*In re Stonewall F.* (1989) 208 Cal.App.3d 1054, 1061, fn. 6 [256 Cal.Rptr. 578].)

the federal government could not be persuaded to be responsible for those levee, "interception of drainage from the east will not be taken care of in the manner contemplated by the design of this project. If that result is allowed to occur, flowage rights will undoubtedly have to be obtained across the low lands east of Reclamation District[] 1000 . . . ."

Minutes of a State Reclamation Board meeting in May 1956 reflect that "both the east and west levees of the district channel were integral parts of the levee and drainage system designed to take care of the intercepted drainage from the foothill areas and for protection against back water from the Sacramento River. . . . [T]hese levees were originally considered practically to grade and section, but as the flood plane[33] was increased with the growth of the Sacramento River Project they were determined to be inadequate and recommended for inclusion in the program of reconstruction work, but that it appeared only a portion of the work on this system was scheduled for prosecution by the Corps of Engineers . . . ."

In a May 1956 letter signed by State Reclamation Board Chief Engineer A.M. Barton (who previously served as district engineer for ARFCD), the state implored the Corps of Engineers to assume responsibility for the east side of the NEMD because "[t]hese levees are all a part of a complete system that takes care of the intercepted drainage from the foothill area to the east and protects against back water from the Sacramento River. [¶] These levees on the east side of the Natomas East Borrow Pit are as vital to this flood control system as the back levees themselves. The opening of the cross canal into the Sacramento River permitted the back water of the river to reach these lands which under natural conditions would not have been flooded from that source."

The Corps of Engineers declined to assume responsibility for the east side of the NEMD north of ARFCD, because it was not included in the formal written documents for the project. Defendants do not cite any evidence to show that they obtained flowage rights, as suggested in RD 1000's letter to the state, or took other action to resolve the problem after the Corps of Engineers declined to assume responsibility.[34]

A 1957 Corps of Engineers design memorandum (copies of which go to the state) indicated with respect to the NEMD: "Any material increase in

[33]"Flood plane" means the position occupied by the water surface of a stream during a particular flood or, loosely, the elevation of the water surface at various points along the stream during a particular flood.

[34]In a petition for rehearing following our original opinion in this case, ARFCD argued for the first time that the 1956 documents were irrelevant to ARFCD, because some of the documents referred to backwater stemming from the *Sacramento* River, and it was assertedly undisputed that the flooding in Rio Linda stemmed from the *American* River. ARFCD thus

the[] flows beyond those computed would cause extensive overbank flooding on undeveloped lands above the project . . . ."[35] The memorandum also

appeared to conclude the 1956 documents reflected concern only about the area North of Sankey Road.

However, this is not the only inference to be drawn from the 1956 documents. Although some of the 1956 documents referred to the Sacramento River, evidence was presented that the American River is subject to backwater flooding from the Sacramento River. Thus, a 1963 Corps of Engineers design memorandum, in discussing the American River, stated the flood plain was "subject to more prolonged flooding by backwater from the Sacramento River . . . ." The 1963 design memorandum also tabulated the "effect of backwater from Sacramento River on water surface elevations in the American River flood plain near the mouth of the river . . . ."

We recognize, as noted by ARFCD, that one of the 1956 documents made reference to the opening of the Cross Canal as permitting backwater flooding. However, this reference, which appeared in only one of the several 1956 documents, does not compel an inference that the *only* concern was the area north of Sankey Road.

Where evidence is subject to opposing inferences, "it must upon a review thereof be regarded in the light most favorable to the support of the judgment." (*Mah See* v. *North American Acc. Ins. Co.* (1923) 190 Cal. 421, 426 [213 P. 42, 26 A.L.R. 123]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 370, pp. 420-421.)

Moreover, although all of the foregoing evidence, along with the 1956 documents, was cited in respondents' brief on appeal, none of the defendants made this attack on the evidence in their reply briefs or at the first oral argument in this court. Reviewing courts need not consider points raised for the first time in a petition for rehearing. (*Prince* v. *Hill* (1915) 170 Cal. 192, 195 [149 P. 578]; 9 Witkin, *supra*, § 851, p. 886.)

ARFCD also pointed out in its petition for rehearing of our original opinion that the final 1956 document indicated the Corps of Engineers agreed to make additional improvements. However, ARFCD did not state what those improvements were. ARFCD also argued, with respect to RD 1000's 1956 letter discussing a need to obtain flowage rights across the "low lands east of" RD 1000, that plaintiffs never introduced evidence identifying what land was at issue. Again, this was a new attack raised for the first time in a petition for rehearing, even though the evidence was cited by plaintiffs in their respondents' brief on appeal. We therefore need not consider the matter. (*Prince* v. *Hill, supra*, 170 Cal. at p. 195; 9 Witkin, *supra*, § 851, p. 886.)

[35]This evidence refutes the defense assertion that it was assumed the project would fail if design capacity were exceeded.

Although we made this same observation in our original opinion in this case, defendants in their supplemental briefs repeat the same frivolous assertion without acknowledging or explaining the evidence cited in the text.

On petition for rehearing following our original opinion, defendants argued for the first time that the 1957 document was not referring to backwater flooding from the NEMD but was referring to overflooding of upstream creeks before the water even reached the NEMD. Defendants quoted the following portion of the 1957 document: "The Condition A flows are conveyed from the foothill line to the canal by many relatively shallow stream channels. Any material increase in *these flows* beyond those computed would cause extensive overbank flooding on undeveloped lands above the project and only an insignificant net increase in inflow to the project." (Italics added.) According to defendants, the term "these flows" refers to flows in the shallow upstream channels. However, the term "these flows" grammatically refers to the "Condition A flows" in the preceding sentence. "Condition A flows" encompass a measurement of flows *in* the NEMD, as is apparent from a reading of the document as a whole. Thus, the passage quoted by defendants appears in the middle of a paragraph which

stated with reference to the Cross Canal: "This project flood plane provides full protection of rapidly developing urban lands in [RD] 1000 from flood conditions of project flood magnitude (estimated frequency of once in 200 years). All other lands east and north of the project levees are agricultural lands that are not expected to become urban within the foreseeable future and therefore do not require such a degree of protection."

In 1982, an environmental impact report for a road widening project noted that flooding within Arcade Creek in the vicinity of Rio Linda Boulevard was "backwater" from the NEMD.

Thus, both before and after construction of Folsom Dam, it was known that it was substantially certain that the public works in the NEMD area would cause flooding of plaintiffs' upstream properties. The foregoing evidence adequately supports the trial court's finding of an intentional diversion.

The state and ARFCD obliquely intimate that there could be no intentional diversion because the risk to plaintiffs' properties would arise only under high flow conditions that would exceed the project's design capacity. However, we have seen that documentary evidence from 1956 contains an admission that if the federal government would not assume responsibility for the east side of the NEMD, interception of drainage from the east would not be taken care of "in the manner contemplated by the design of the project." Moreover, in our view the critical fact is that defendants were given notice that the risk existed.

We conclude substantial evidence supports the judgment with respect to these issues.[36]

---

begins by describing Condition A and B flows as computation of flows "along" the NEMD. Had the document intended to say that upstream creeks would overflow before the water reached the NEMD, there would be no need for the final phrase in the quoted passage to qualify that the overbank flooding would cause only an insignificant "net" increase in inflow to the project. The term "net" suggests that some water comes in, some goes back out.

At most, the evidence is susceptible to conflicting inferences, and we adopt the inference favorable to the judgment. (*Mah See* v. *North American Acc. Ins. Co., supra,* 190 Cal. at p. 426.) Moreover, we note defendants never made this attack on the evidence in their reply briefs, even though the evidence was cited by plaintiffs in their respondents' brief on appeal. That default alone is sufficient reason for rejection of this belated attack. (*Prince* v. *Hill, supra,* 170 Cal. at p. 195.)

[36]In their reply briefs, the state and ARFCD ignore the evidence favorable to the judgment cited in plaintiffs' brief. RD 1000 acknowledges the evidence cited in plaintiffs' brief but claims the evidence did not convince the trier of fact because the statement of decision assertedly contained no finding that *defendants knew* plaintiffs' properties would be or were substantially certain to be flooded as a result of the project.

### 4. *Natural Conditions*

 RD 1000 contends it cannot be liable for diversion because its artificially created channels have been transformed into natural conditions by the passage of time. RD 1000 cites dated authority relieving public entities of responsibility for diversions after passage of a long period of time on the theory an entity should not be liable in perpetuity because the existing conditions of the area will change over time. (E.g., *Weck* v. *L. A. etc. Flood Control Dist.* (1951) 104 Cal.App.2d 599, 608-610 [232 P.2d 293].) However, that authority predated the Supreme Court's shift in focus in inverse condemnation cases from the common law to the Constitution.[37] (*Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250.) *Locklin, supra,* 7 Cal.4th 327, found it unnecessary to address whether a public entity had a continuing obligation to monitor the impact of public works as urbanization occurs. (*Id.* at p. 373.) However, we agree with Justice Mosk's concurring opinion in that case that "[i]t appears to follow inescapably from the principles of inverse condemnation liability . . . that when the [defendant] is a public entity, such an obligation to monitor does exist." (*Id.* at p. 379 (conc. opn. of Mosk, J.).)

In a supplemental brief, RD 1000 contends *Bunch II* "destroys" the proposition that public agencies have a continuing duty to monitor flood control works. We disagree. RD 1000 relies on the following language in *Bunch II*: "As Professor Van Alstyne explained, 'Plan or design characteristics that incorporate the probability of property damage under predictable circumstances may later be judicially described as "negligently" drawn; yet, in the original planning process, the plan or design with its known inherent risks may have been approved by responsible public officers as being adequate and acceptable for non-legal reasons. For example, the damage, although foreseeable, may have been estimated at a low order of probability, frequency, and magnitude, while the added cost of incorporating minimal safeguards may have been unacceptably high in proportion to available manpower, time and budget. . . . The governmental decision . . . to proceed with the project under these conditions thus may have represented a

---

In its statement of decision, the trial court found "defendants at all times knew or should have known of the risk to plaintiffs caused by the SRFCP." This finding is ambiguous with respect to whether defendants actually knew of the risk. Yet RD 1000 did not object to the statement of decision on this basis, and, hence, has waived the ambiguity. (Code Civ. Proc., § 634; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1132 [275 Cal.Rptr. 797, 800 P.2d 1227].)

[37]RD 1000 also cites *Tri-Chem, Inc.* v. *Los Angeles County Flood Control Dist.* (1976) 60 Cal.App.3d 306, 313-314 [132 Cal.Rptr. 142], on the question of a continuing duty. However, the point there was that since the government had no duty to provide any flood protection, its provision of protection did not impose upon it a continuing duty to augment the level of its protection to meet changing conditions. (*Ibid.*) That case is inapposite, because here the issue is a continuing obligation to monitor a risk created by the public entities.

rational (and hence by definition non-negligent) balancing of risk against practicability of risk avoidance.' [Citation.]" (*Bunch II, supra,* 15 Cal.4th at p. 450.)

However, nothing in this language addressed the issue whether a public entity has a continuing duty to monitor its public works. Obviously, the original design will be the starting point for analysis. No issue of continuing duty to monitor was presented or decided in *Bunch II.* ■ Cases are not authority for propositions not therein considered. (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].)

■ We conclude the passage of time does not relieve defendants of liability.

### 5. *Conclusion re: Properties Other Than Strawberry Manor*

We conclude that, with respect to the properties other than Strawberry Manor (i.e., Rio Linda and north of Sankey Road), defendants may be liable for inverse condemnation without proof that they acted unreasonably, if plaintiffs' properties were not historically subject to flooding in the absence of the flood control works at issue. We remand for the limited purpose of having the trial court make a finding on that issue, and we leave it to the trial court to decide whether to allow the introduction of new evidence on the matter.

If the trial court finds plaintiffs' properties were historically subject to flooding, it shall determine whether plaintiffs are entitled to compensation by using the *Belair* reasonableness test, applying the *Locklin* factors, as stated in *Bunch II.* We leave it to the trial court to decide whether to allow the parties to adduce new evidence on this issue.

If the trial court finds plaintiffs' properties were not historically subject to flooding, then *Belair*'s reasonableness standard does not apply, and the trial court's original decision is sustainable on the grounds there was an intentional diversion creating a risk of flooding in order to use private property as a retention basin to save other property.

### B. *Unreasonable Conduct—Strawberry Manor*

■ As to Strawberry Manor, *Belair* applies because, as found by the trial court, that property flooded when a flood control system designed to protect it failed. Plaintiffs do not dispute that *Belair* applies to this system failure.

However, the trial court did not apply the *Locklin* factors, as endorsed in *Bunch II.* As noted, *Locklin* was decided after the trial court's decision in this

case. Although plaintiffs argue remand is not necessary, we believe it is appropriate to have the trial court consider the *Locklin* factors.

We shall therefore reverse and remand to the trial court for the purpose of making findings under the *Locklin* factors. We leave it to the trial court to decide whether to allow new evidence to be adduced.

We now dispose of another contention raised on appeal.

RD 1000 argues it should not be liable for the Strawberry Manor damages, because they occurred outside RD 1000's territory, and RD 1000 is not responsible for the other defendants' failure to have a plan to close the gap. We disagree, however, because the trial court found the back levee was a substantial concurring cause of damage in Strawberry Manor. Nevertheless, since there was a system failure with respect to Strawberry Manor, we believe *Belair*'s reasonableness standard applies to all defendants, including RD 1000.

## II. *Causation*

Defendants contend plaintiffs also failed to establish the element of causation, and the sole cause was the unusually heavy "storm of record" which exceeded the project's design capacity.

Causal connection in inverse condemnation requires a showing of "a ' "substantial" cause-and-effect relationship excluding the probability that other forces *alone* produced the injury.' " (*Belair, supra,* 47 Cal.3d at p. 559, original italics.) *Belair* recognized that causation is established where a public improvement constitutes a substantial concurring cause of the injury, even though other, independently generated forces contribute to the injury. (*Ibid.*)

The state and RD 1000 argue the only way in which causation can be shown is if the flood control works fail to function as intended. They cite the following language in *Belair*: "Where independently generated forces not induced by the public flood control improvement—such as a rainstorm—contribute to the injury, proximate cause is established where the public improvement constitutes a substantial concurring cause of the injury, i.e., where the injury occurred in substantial part because the improvement failed to function as it was intended." (*Belair, supra,* 47 Cal.3d at p. 559-560, italics omitted.)

However, this does not mean that public entities are immune from inverse condemnation liability if a flood control project causes damage to private property *while the project is functioning as intended.* The *Belair* court's use of the phrase "failed to function as it was intended" was a means of fleshing out the requirement for pleading substantial causation based upon the particular factual underpinnings of the case. In *Belair* the water escaped from a

levee constructed to protect a site that had been historically subject to flooding. (*Belair, supra,* 47 Cal.3d at p. 556.) Therefore, to show that defendant's facility was a substantial cause of injury to that site, it was necessary for the plaintiff in *Belair* to eliminate the other probable cause of damage, i.e., natural flooding. This in turn required focusing on the functional capability of the failed public project: If the levee had overflowed after it reached its design capacity, instead of when it was still below capacity, the cause of flooding might have been nature alone. Although nature had a hand in the injury produced in *Belair,* the levee there failed to protect plaintiff even when it was not operating at capacity, thus it failed to function as intended, presenting a substantial cause of the injury. *Belair* did not create an immunity for damages caused to private property by a project functioning as intended. Such a result would be absurd.

In a related contention, defendants argue the trial court erred in finding it irrelevant that the flooding occurred when storm conditions exceeded the project's design capacity.[38] They suggest that since none of plaintiffs' properties were flooded until *after* SRFCP's design capacities were exceeded, SRFCP was not a substantial concurring cause of the flooding of plaintiffs' properties. ARFCD claims that even assuming the project's design was unreasonable, there can be no liability under *Belair* unless the damage occurred while the conditions were within design capacity. Otherwise, the project is not a cause of the damage, says ARFCD. In support of these arguments defendants cite the following language from *Belair*: "The public improvement would cease to be a substantial contributing factor, however, where it could be shown that the damage would have occurred *even if the project had operated perfectly, i.e., where the storm exceeded the project's design capacity.* In conventional terminology, such an extraordinary storm would constitute an intervening cause which supersedes the public improvement in the chain of causation." (*Belair, supra,* 47 Cal.3d at p. 560, italics added.)

However, the *Belair* court was speaking with reference to the facts present in that case; it was not establishing a rule of law that a flood control project becomes immune when storm conditions exceed design capacity. The facts in *Belair* were that there was a failure of a project designed to protect

---

[38]Plaintiffs dispute that design capacity was exceeded. We will assume for the sake of argument that it was.

As noted in our discussion of sufficiency of the evidence (fn. 35, *ante*), defendants suggest it was assumed the project would fail if design capacity were exceeded and therefore they had no reason to suspect plaintiffs' properties would be flooded. However, besides failing to cite evidence in their favor on this point, defendants fail to acknowledge contrary evidence—the 1957 Corps of Engineers design memorandum (copies of which went to the state), which stated any material increase in flows beyond those computed "would cause extensive overbank flooding on undeveloped lands above the project."

properties that were historically subject to flooding from natural causes. Thus, if the flood control project worked perfectly and the storm exceeded the design capacity, the storm could be the *sole* cause of the injury. This principle is a corollary to the rule that public entities have no duty to provide protection against flooding from natural causes. (See e.g., *Tri-Chem, Inc.* v. *Los Angeles County Flood Control Dist., supra,* 60 Cal.App.3d 306.) The statement in *Belair* is thus predicated on accidental flooding from natural forces exceeding design capacity breaching a project designed to reduce the risk of harm from natural forces.

In contrast, the case before us does not involve a project failure but an intentional use of plaintiffs' properties as a retention basin, thereby causing flooding to lands which were arguably not historically subject to flooding, in order to protect other property. Thus, the fact that design capacity was exceeded would not make the rainstorm the sole cause of the damage. If the public works were at a minimum a substantial concurring cause, that is all that is needed to establish causation under *Belair, supra,* 47 Cal.3d at page 559.[39]

In supplemental briefs, defendants contend *Bunch II* endorsed *Belair*'s rule that an extraordinary storm exceeding design capacity is an intervening cause that supersedes the public improvement in the chain of causation. We have explained that *Belair* did not so hold. Nor does anything in *Bunch II* so hold. The Bunches argued the reasonableness standard should not apply because the storm that breached the flood control facility exceeded the facility's design capacity. (*Bunch II, supra,* 15 Cal.4th at p. 454.) They argued the public entity should be strictly liable for inadequate improvements. The Supreme Court said no, because a public entity that seeks to protect property from flood damage is not the absolute insurer of lands it seeks to protect, and the focus should be whether the entity acted reasonably in designing, constructing and maintaining the system, not whether it could ensure no flooding would ever occur. (*Ibid.*) Nothing in *Bunch II* alters our analysis. The Bunches sought to make the public entity strictly liable for failing to guard against a bigger storm. Here, plaintiffs seek to make defendants liable for creating a risk. As noted by *Bunch II, supra,* 15 Cal.4th

---

[39]If some water would have entered plaintiffs' homes in the absence of the public works, defendants could still be liable because the public works were a substantial concurring cause of damage. (*Belair, supra,* 47 Cal.3d at pp. 556-560.) However, in that event, the fact that some water would have entered the property without the project might mean the property was historically subject to flooding. Therefore, that property would be subject to a reasonableness standard.

We note the trial court concluded in its statement of decision that three plaintiffs—Collier, Risse and Kellogg—would have received some minimal flooding (a few inches or flooding of one room) even in the absence of the project. If the trial court concludes upon remand that these three properties or any other parcels were historically subject to flooding, the reasonableness standard shall apply to those plaintiffs.

at page 450, a flood control project may alter risks to land historically subject to flooding, increasing certain risks in order to reduce others. Alteration of nature-made risks is different, however, from the situation alleged by plaintiffs in this case—creation of a man-made risk, using private property not historically subject to flooding as a retention basin to protect other property. *Bunch II* said a flood control agency does not necessarily exact a disproportionate and thus compensable contribution from particular landowners simply because it constructs adjacent flood control improvements "that may alter how floodwaters will affect those landowners if the improvements fail to contain the flow." (*Ibid.*) That is not what plaintiffs seek to do in this case. They seek to obtain compensation for the government's intentional appropriation of their property as a temporary retention basin in order to protect other property. If plaintiffs' properties were not historically subject to flooding, strict liability in this case would not make defendants "absolute insurers," contrary to ARFCD's contention. We also reject ARFCD's suggestion that our conclusion is unfair, because when a storm overwhelms a project, the flooded area would be a "crazy quilt" of properties for which the project increased the risk (whose owners could sue) and properties with a lower risk (whose owners would be barred). It is not unfair to compensate owners whose property was intentionally used as a retention basin to protect other property, while potentially denying compensation on lack of causation grounds to an owner whose property is historically subject to flooding and gets flooded by a storm which exceeds the design capacity of flood control works.

In Strawberry Manor, where the public works did not operate as intended, the trial court found the storm alone would not have produced the injury. The risk of flooding, and the actualization of that risk, did not derive from the rainstorm alone. The risk and resultant damage were caused by man, not nature. The water which inundated Strawberry Manor would not have been there but for defendants' public works, which sought to protect lower lying lands.

Thus, the storm was not the sole cause of plaintiffs' injuries, even though the storm exceeded the project's design capacity. The public works were at a minimum a substantial concurring cause of the damage, which is sufficient to impose liability against defendants. (*Belair, supra,* 47 Cal.3d at p. 559.)

Defendants and amici curiae point out the government has no duty to provide any particular level of flood protection, no duty to provide the same degree of protection to all properties, and no duty to provide any flood protection at all. (*Tri-Chem, Inc.* v. *Los Angeles County Flood Control Dist., supra,* 60 Cal.App.3d 306; *Shaeffer* v. *State of California* (1972) 22 Cal.App.3d 1017, 1021 [99 Cal.Rptr. 861].) They say imposition of liability in this case will require public entities to overbuild flood control projects and become insurers of private property.

However, we do not hold that the government must provide flood protection nor do we mandate a particular type or level of protection. In the cases cited by defendants, the plaintiffs' lands were historically subject to flooding due to natural causes, and the public entities which undertook to protect those lands were held not liable because the evidence disclosed the flooding occurred in spite of, not because of, the flood control improvements. (*Tri-Chem, Inc.* v. *Los Angeles County Flood Control Dist., supra,* 60 Cal.App.3d at p. 310; *Shaeffer* v. *State of California, supra,* 22 Cal.App.3d at p. 1019; see also *Belair, supra,* 47 Cal.3d at pp. 561-562.) What defendants overlook is that, if plaintiffs' properties were not historically subject to flooding, defendants created a risk to plaintiffs in order to protect other property. Therefore, the cited cases are inapposite.

Defendants claim they would be in a better position had the project failed (because *Belair*'s reasonableness standard would apply). However, had the project failed and water flooded the areas the back levee and the NEMD were built to protect—the lower lying lands to the west and south—it makes perfect sense that defendants be judged under the reasonable conduct standard, because they would not have created the risk to the damaged lands.

RD 1000 argues it is not liable for any damage caused by Sutter County's closure of a gap in Sankey Road. The contention is vague and fails to explain what RD 1000 is talking about. In any event, the trial court found the "project contemplated closing the gap in the levee at Sankey Road . . . ." RD 1000 fails to show any ground for reversal based on closure of the gap in Sankey Road.

We conclude defendants fail to show any reversible error regarding causation.[40]

III. *Joint and Several Liability*

██ Defendants and amici curiae contend defendants cannot be held jointly and severally liable. We shall remand for the trial court to consider this issue in light of *Bunch II.*

*Bunch II* said ". . . a property owner whose unreasonable acts cause damage to neighboring property is liable only for its proportionate share of the damage. When the upstream owner is a public entity, the court must also

---

[40]On April 18, 1995, plaintiffs filed in this court a motion for judicial notice of documents assertedly related to the causation issue— (1) a June 1993 resolution of the Sacramento Area Flood Control Agency (SAFCA), and (2) a January 1991 joint exercise of powers agreement reflecting that RD 1000 and ARFCD are members of the SAFCA. Plaintiffs concede we have discretion whether to grant their request. (Evid. Code, § 459.) We deny the motion for judicial notice as tardy. (See *Simmons* v. *Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 368 [133 Cal.Rptr. 42].) It was not filed until almost two years after the resolution was adopted and three months after the January 17, 1995, completion of briefing in this appeal.

consider the nature of the improvement or public work, the degree to which its value offset the property damage, and all other relevant matters, including whether the utility of the possessor's use of land outweighs the risk of damage to the property. (*Locklin, supra,* 7 Cal.4th at pp. 359-360.) While the public entity must bear its proportionate share of liability, it is not subject to joint liability, but only to several liability. (*Id.* at p. 372, citing *Mehl* v. *People* ex. rel. *Dept. Pub. Wks.* (1975) 13 Cal.3d 710, 718 [119 Cal.Rptr. 625, 532 P.2d 489].)" (*Bunch II, supra,* 15 Cal.4th at p. 447.)

Here, the trial court found in its statement of decision: "The SRFCP is a cooperative Federal-State venture. It is a State project whereby the State has delegated some duties to the Districts (RD 1000 and ARFCD). The operation of the completed project is the sole responsibility of the State. [Citation.] The Districts have been created as agencies of the State for the more convenient handling of the details of this gigantic undertaking. [Citation.] The Federal government has contributed to the construction and helped finance the project but has required the State to hold it free and harmless from all claims due to the construction of the project. . . .

"The 1953 MOU, section 4, confirms the State's obligation to operate and maintain all completed works of the SRFCP including those which had previously been constructed by the local entities. The State may not claim an exemption from liability by entrusting or delegating its duty to any of the local districts. The Districts and the State are joint participants in the project.

"All defendants have joined in the project and have substantially participated in the design, construction, operation, maintenance and financing of the improvements and have the duty to operate and maintain it pursuant to state and federal law. The project works, flood control and real property interests of RD 1000 and ARFCD are owned jointly with the State."

We conclude the trial court did not adequately consider the question of proportionate liability, and the matter should be remanded for the trial court to do so.[41]

---

[41]We do not read *Bunch II* as precluding the possibility of finding two or more public entities each responsible for 100 percent of a plaintiff's damages where multiple entities jointly participate in the same public project. Thus, in *Talbott* v. *Turlock Irr. Dist.* (1933) 217 Cal. 504 [19 P.2d 980], joint liability was imposed against an irrigation district and an improvement district for damages involving an irrigation ditch, where both districts were in joint charge of the public works. (*Id.* at p. 506.) The Supreme Court saw no reason for segregation of their liability. (*Ibid.*) We do not believe *Talbott* is inconsistent with *Bunch II* or the cases cited therein, which did not involve joint participation of multiple entities in the same public improvement.

The state argues no substantial evidence exists to support a finding that it was a substantial participant in the planning, design, construction and/or maintenance or operation of the flood control works. However, the state has waived this argument by failing to acknowledge

ARFCD claims plaintiffs provided no basis in the record for the trial court to make such allocations of proportionate liability. We leave that determination for the trial court. We do not believe the parties should be allowed to adduce new evidence on this issue, since they should have done so in the original trial.

## IV. *Estoppel*

RD 1000 contends the Barosso plaintiffs are estopped by a 1914 eminent domain judgment in favor of RD 1000 against the Barossos' predecessor in interest. We disagree.

The existence of an estoppel is generally a question of fact for the trier of fact, and ordinarily the trial court's determination is binding on appeal unless the contrary conclusion is the only one to be reasonably drawn from the facts. (*Albers* v. *County of Los Angeles, supra,* 62 Cal.2d at p. 266.)

Here, the trial court found the terms of the eminent domain judgment prohibited RD 1000 from raising the back levee without also raising railroad and wing levees. The back levee was so raised in 1956. The trial court found it was not reasonably foreseeable in 1914 that RD 1000 would contribute to property damage by violating the judgment. RD 1000 fails to show a contrary conclusion is the only one to be reasonably drawn from the facts.

We conclude RD 1000 fails to show any basis for reversal based on estoppel.

---

evidence favorable to the judgment. (*Foreman & Clark Corp.* v. *Fallon, supra,* 3 Cal.3d at p. 881; *Niederer* v. *Ferreira* (1987) 189 Cal.App.3d 1485, 1510 [234 Cal.Rptr. 779].) Thus, the state entered the 1953 memorandum of understanding with the federal government, as authorized by Water Code section 8617, to give assurances to the United States that the state would maintain and operate the SRFCP in accordance with federal regulations. The State Reclamation Board's general manager testified it is the state's responsibility to work together with the local districts to make sure the state fulfills its federally mandated assurances.

Under a heading contending there is no substantial evidence of the state's substantial participation, the state cites provisions of the Water Code for the asserted proposition that local agencies are responsible for maintenance and operation of the flood control works and must hold the state harmless. However, aside from the state's violation of California Rules of Court, rule 15(a), by failing to set forth this argument in a discrete heading (see *People* v. *Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521] [reviewing court may disregard undeveloped points not set forth as discrete contentions]), the state fails to show that the statutes preclude liability in actions by third parties.

The state raises other Water Code provisions elsewhere in its brief in an argument which appears under a heading broadly attacking the trial court's conclusion of joint and several liability but which in substance attacks only the trial court's conclusion that local districts are agents of the state. We need not address the question of agency.

## V. *Standing*

■ RD 1000 contends plaintiffs Lee and Shirley Collier lack standing because a 1985 quitclaim deed to Mr. Collier's widowed mother inadvertently transferred all of the Collier plaintiffs' interest in the property. We disagree.

The Colliers had intended to transfer only 11½ acres and retain title to the remaining ½ acre where they have lived and paid taxes continuously since 1959. The one-half acre was quitclaimed back to the Colliers in 1991.

"[T]he universal rule appears to be that where property is purchased which is subject to pending condemnation proceedings and the deed conveying said property is silent as to the award money to be paid in the proceedings, said money belongs to and is payable to the purchaser. [Citations.]" (*Brick* v. *Cazaux* (1937) 9 Cal.2d 549, 554 [71 P.2d 588].)

Although *Brick* is a case of direct, rather than inverse, condemnation, we can think of no reason why its rule should not apply here. Under *Brick*, the Colliers have standing to pursue and receive their share of the inverse condemnation recovery.

## VI. *Offset*

RD 1000 complains the trial court failed to apply settlement moneys received from other defendants as offsets against the judgment. The contention is waived by failure to cite any legal authority. (*Atchley* v. *City of Fresno*, *supra*, 151 Cal.App.3d 635, 647.)

### DISPOSITION

The judgment is reversed and the case remanded for proceedings consistent with this opinion. Defendants shall bear their own costs on appeal. Plaintiffs are awarded their reasonable costs, disbursements and expenses incurred on appeal, including reasonable attorney fees in an amount to be determined by the trial court. (See Code Civ. Proc., § 1036.)

Davis, J., and Callahan, J., concurred.

Petitions for a rehearing were denied February 23, 1998, and the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied May 13, 1998. Brown, J., did not participate therein.